1  **POULIN | WILLEY | ANASTOPOULO, LLC**

2  Eric M. Poulin (California Bar No. 298476)

3  Blake G. Abbott (*Pro Hac Vice* Forthcoming)

4  Paul J. Doolittle (*Pro Hac Vice* Forthcoming)

5  32 Ann Street

6  Charleston, SC 29403

7  Telephone: (803) 222-2222

8  Email:

9      eric@akimlawfirm.com

10      blake@akimlawfirm.com

11      pauld@akimlawfirm.com

12  Attorneys for Kameron Masters

13  Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Kameron Masters, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| DoorDash, Inc., | |
| Defendant. | |

Plaintiff Kameron Masters ("Masters" or "Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits the following for her Complaint against DoorDash, Inc. ("DoorDash" or "Defendant") and alleges upon personal knowledge as to herself and her own acts and experiences, as to all other matters, upon information and belief, including

investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit as an individual who subscribed to and purchased delivery services provided by Defendant DoorDash, Inc.

2.      Unfortunately, the rates Plaintiff paid for Defendant's services were hiked, resulting in Plaintiff, and all others similarly situated, paying artificially inflated rates for services, when compared to users of other types of mobile phones.

3.      Specifically, Plaintiff and all others similarly situated, were charged higher rates for services from Defendant because they are iPhone users, rather than Android users.

4.      This action challenges certain fees that are charged by DoorDash. DoorDash is an "online marketplace platform using web-based technology that connects contractors, restaurants and/or other businesses" to provide business-to-consumer deliveries."

5.      DoorDash is a massive corporation, with an estimated 32 million users that generate billions of dollars of annual revenue for Defendant.[1]

6.      Despite having billions of dollars in revenue and tens of millions of customers, DoorDash has engaged in deceptive business practices. DoorDash's practices take advantage of all sorts of individuals, such as: struggling merchants, an immigrant workforce, a workforce made up of lower-socioeconomic individuals, and consumers. As a foreseeable result of the above practices, DoorDash has been sued.[2]

7.      Specific to the present action, DoorDash takes advantages of consumers through a number of fees that are artificially and needlessly inflated. The purpose of this lawsuit is

---

1. David Curry, *DoorDash Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (May 2, 2023), https://www.businessofapps.com/data/doordash-statistics/.

2. *AG Racine Reaches $2.5 Million Agreement with DoorDash for Misrepresenting that Consumer Tips Would Go to Food Delivery Drivers*, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA (Nov. 24, 2020), https://oag.dc.gov/release/ag-racine-reaches-25-million-agreement-doordash.

CLASS ACTION COMPLAINT              2

to expose Defendant's pricing schemes and hold Defendant accountable for its massive fraud on consumers.

8. Although DoorDash is roughly only a decade old, Defendant's history is packed full of examples of unlawful business practices aimed at unlawfully depriving consumers of all sorts of funds.

9. The first of these unlawful practices is DoorDash's retention of contracted drivers' tips. In practice, DoorDash operates quite similar to ridesharing services, but instead of offering rides for consumers, DoorDash's contracted drivers deliver products to consumers. Under this model, much like rideshare services, the contracted drivers are paid tips by consumers. Instead of giving these tips to their contracted drivers, DoorDash keeps these tips for itself. As reasonably expected and mentioned earlier, DoorDash was sued for such a practice. Defendant now purportedly pays their contracted drivers the entire tip amount. But this is a bit questionable in reality as Defendant retains these tips for up to one week prior to the release to the contracted drivers, even though Defendant could pay the contracted drivers immediately. Evidence of the previous sentence is Defendant's willful addition of insult to financial injury as Defendant will allow their contracted drivers to access their own tips daily, but only if the contracted drivers pay a fee to release the funds. This release fee, which allows contracted drivers their own money, is called a "Fast Pay" fee.[3] DoorDash stands to make millions through this scheme of depriving its contracted drivers of their own generated tips.

10. This tip retention scheme is even more complex than just the simple withholding funds, as DoorDash will allow its contracted drivers to access their own tips for free but only if these contracted drivers enroll in an even more profitable program.

_____

3. DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited May 3, 2023).

CLASS ACTION COMPLAINT                    3

11.     The above tip retention program is called the DasherDirect Program.[4] In this program, Defendant pays participating contracted drivers (which were targeted for their immigrant status) their own tips immediately for free but with several stipulations and complications.[5]

12.     The first of these stipulations being that the immediate, formerly repossessed, tips are provided on a VISA debit card which is underwritten by Stride Bank.[6] Stride Bank, as expected, must make money on this transaction. Stride Bank does this through pooling the contracted drivers' funds and places those funds into banks for investment purposes.

13.     Stride Bank is not the only DoorDash entity involved, as Payfare, Inc. created a mobile application for the DasherDirect Program that allows Dashers to conduct digital banking with Stride Bank. The DasherDirect Program and/or Stride Bank are enterprises that in effect control most of the Dashers' funds for much longer than a week.

14.     Upon information and belief, DoorDash receives fees under the DasherDirect Program from the drivers' invested funds and their debit card usage and those fees exceed what DoorDash would earn charging drivers only for Fast Pay fees.

15.     In addition to DoorDash extorting its own contracted drivers, DoorDash extorts the restaurants that provide the food that DoorDash delivers. DoorDash states that it's not a restaurant or in the food preparation business, but DoorDash takes food orders and retains funds from such orders as a commission for such orders.[7]

---

4. DoorDash Dasher Support, *What is Fast Pay?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-Fastpay?language=en_US (last visited May 3, 2023).

5. Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 7 (Feb. 24, 2023).

6. DoorDash, FACEBOOK (Sept. 6, 2022, 12:23 PM), https://www.facebook.com/DoorDash/posts/pfbid035wvdSt6aJZ9TJEEn15o7vBGF71x3DvFZFb2XdWLzCEx4yccKAPzL5hiT51Sfj49fl;

7. Claudia Irizarry Aponte, *DoorDash Wanted to Teach Delivery Workers About Their Rights. It Backfired.*, THE CITY (July 31, 2022, 7:00 PM EST), https://www.thecity.nyc/queens/2022/7/31/

16.     This retention is not a fee for service, but rather a portion of the order price taken away from the restaurants. DoorDash also includes fees in promotional and sponsored menu items advertised for sale on the platform without ever informing consumers about those fees.

17.     Because DoorDash's hidden fees (which include hidden commission, marketing, sponsored listing, and credit card transactions fees) reduce profit margins on food orders, restaurants must increase their prices.

18.     DoorDash in effect earns millions, if not more, strong-arming drivers and merchants (and forcing them to capitulate to DoorDash's questionable billing tactics), while consumers bear the unsettling burden of the increased cost from the hidden fees.[8]

19.     DoorDash's consumer-facing, predatory pricing practices are unsettling in several other respects. First, DoorDash charges consumers "city" or regulatory response fees, creating the illusion for consumers that local governments impose these fees. DoorDash engages in this deceptive practice in part to circumvent limitations on food commissions in certain areas. Cities have sued DoorDash for imposing these unauthorized fees.[9]

20.     Second, DoorDash provides no delivery, but still charges consumers a range of delivery fees.

21.     Third, DoorDash disavows that it controls the manner and means of deliveries, but still charges consumers an "express" or "priority" fee for delivering "direct to you."

---

23284495/doordash-immigrant-groups-workers (noting that immigrant drivers accused DoorDash of stealing their money).

8. Kimiko de Freytas-Tamura, *Food delivery apps are booming, while their workers often struggle.*, N.Y. TIMES (Nov. 30, 2020), https://www.nytimes.com/2020/11/30/ world/food-delivery-apps-are-booming-while-their-workers-often-struggle.html;

9. Craig Clough, *Chicago Accuses Grubhub, DoorDash Of Deceptive Practices*, LAW360 (Aug. 27, 2021, 6:03 PM EST), https://www.law360.com/consumerprotection/ articles/1417060/chicago-accuses-grubhub-doordash-of-deceptive-practices

CLASS ACTION COMPLAINT                    5

DoorDash promises this "direct to you" service without ever informing Dashers (whom DoorDash knows may deliver for companies besides DoorDash) that the DoorDash consumers paid for a priority delivery that is advertised as going directly to them. As a result, these "express" delivery orders average around the same delivery time as standard orders.

22.    Finally, DoorDash charges consumers an "expanded range delivery" fee on orders "outside of [their] normal delivery area," but DoorDash never creates "normal delivery areas" for each consumer. Rather, DoorDash creates delivery areas around restaurants based on the restaurants' service level plan (meaning how much they pay DoorDash). And DoorDash may send certain consumers' orders (like low-cost McDonalds orders) to restaurant locations further from the consumer's home (bypassing closer locations), which may trigger the expanded range fee, and "justify" increased "delivery" costs.

23.    Moreover, DoorDash applies the expanded range fee on occasion as a likely method to subsidize lost revenues from discounted fees under the DashPass Program (which are consumer accounts that pay DoorDash a flat monthly fee for discounted delivery fees). And, as tests indicate, DoorDash charges the expanded range fee on iPhone users more often than Android users and charges iPhone users more for "delivering" (likely because studies reveal iPhone users earn more). These tactics are simply money grabs.

24.    DoorDash's fees are deceptive, misleading, and otherwise fraudulent. DoorDash promises services that it does not provide, including charging consumers a premium amount for deliveries that DoorDash does not perform. DoorDash's "delivery" fees are designed to make the "service fee" it charges to "operate" its technology appear smaller. After all, as even DoorDash concedes in obscure fine print, it "has no obligation to itemize its costs" under the many different categories of fees that DoorDash advertises.[10]

---

10. *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(a) (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

1    Rather, DoorDash uses this deceptive practice to trick consumers into believing Dashers

2    receive the "delivery-related" fees when, in reality, each and every "delivery fee" is

3    retained in total by DoorDash. If DoorDash instead bundled all of its delivery fees into

4    one large service fee, that practice would raise questions in a consumer's mind whether

5    using DoorDash's platform is truly worth the cost. In other words, DoorDash utilizes a

6    psychologically manipulative pricing structure that strategically misleads, deceives, and

7    defrauds consumers into using the technology platform at a much higher, premium cost.

8    25.    Two critical components of DoorDash's fraud are its misleading "explanations" of

9    fees and its false advertising on its app and on its website. DoorDash uses oddly placed

10    informational tabs that are designed to dissuade consumers from seeking more details

11    about the true nature of its charges through misleading and contradictory statements. The

12    consumer can only find "more details" about Defendant's fees by piecing together its

13    statements in legal terms and other admissions buried in various places on its website.

14    DoorDash also uses deceptive strikethrough pricing, partition pricing, drip pricing, price

15    discrimination and dark patterns as part of a bait-and-switch advertising scheme to

16    market food and delivery costs to consumers. DoorDash defrauds consumers through

17    "estimated" delivery windows. The delivery windows advertised before an order is

18    placed are usually far less than actual delivery windows, which are shown immediately

19    after an order is placed.

20    26.    The consistent difference between the advertised and real delivery windows

21    suggests DoorDash uses an algorithm to set shorter advertised delivery windows to

22    mislead consumers into believing orders will be delivered sooner.

23    27.    Indeed, DoorDash uses algorithms and "engineering" in virtually all aspects of its

24    operations to maximize profits even at the sake of candor.

25    28.    Moreover, DoorDash uses e-mails and text messages to carry out its fraudulent

26    scheme on unsuspecting consumers. DoorDash's use of the mail, text messages, and e-

27    mail to further its fraud on consumers represents predicate acts for its racketeering

28    activities. DoorDash then uses the mail to send its advertisements with purported

"discount offers" that solicit consumers to become victims of its fraudulent billing practices.

29.     DoorDash then invests the money it has received from its fraud on consumers in the DasherDirect Program, which, in turn, generates even more money for DoorDash.

30.     In the end, DoorDash dupes naive consumers into paying more for using its platform and paying for services they never receive. DoorDash's pattern of illegal pricing practices not only violates federal, state, and common laws, but also deprives consumers of millions, if not billions, of dollars annually.

31.     Far worse, DoorDash directly targets minor children as part of its deceptive and deceitful scheme. DoorDash engages in advertising campaigns on television and in social media (like its Sesame Street campaign) that encourage minors to use its service. DoorDash does nothing to discourage the android Play Store from advertising its App as "E" for everyone, and DoorDash does nothing to limit the Apple App Store from advertising it as 12+ or otherwise restrict minors from downloading the DoorDash App.

32.     Nor does Defendant use any age verification methods to stop minors from using or registering for the app or platform, even though Defendant could do such. In fact, DoorDash has no age requirements at all. Further, the platform is so easy to use that a two-year-old once ordered 31 cheeseburgers.[11]

33.     Aside from two-year-olds, high schoolers also frequently order DoorDash, so much so that high schools have tables set up for DoorDash deliveries or either banned DoorDash at their schools due to safety risks.

34.     As a result of the above, children are faced with danger and are subject to predatory pricing, and DoorDash does not care.

35.     A main reason for this apathy, is DoorDash's misguided faith in its own Terms and Conditions (hereinafter "Terms"). These sets of Terms and Conditions is the foundation

_____

11. Good Morning America, *2-year-old orders 31 cheeseburgers via DoorDash after taking mom's phone*, YOUTUBE (May 19, 2022), https://www.youtube.com/watch?v=Bk2vLDGJ2rw.

1    for Defendant's illegal pricing practices. Defendant's Terms transform recognized

2    liability avoidance into illegal liability evasion.

3    36.    Defendant's Terms strip consumers of recognized protections by: forcing them to

4    waive their right to trial, obligating consumers to indemnify DoorDash for liability,

5    reducing the statute of limitation from years to six months, prohibiting consumers from

6    exercising their rights as a class, and restricting consumers' right to injunctive relief.

7    DoorDash relies on the fact that hungry consumers will likely fail to notice, read, or

8    otherwise understand the Terms, and DoorDash buries many of its highly deceptive bait

9    and switch practices in pages of legalese.

10    37.    With these Terms of adhesion in place (coupled with the nominal cost of each

11    consumer transaction and virtually no exposure from its drivers or merchants given their

12    own restrictive contracts), DoorDash acts with impunity in its charging practices.

13    38.    Defendant believes it has created the perfect predatory pricing scheme – one in

14    which it makes all the rules, keeps all the money, and everyone else is deprived of their

15    own funds and legal rights.

16    39.    In effect, Defendant uses its Terms as a shield for liability and a sword to

17    accomplish its deception. Defendant accomplishes the above by using its Terms to

18    defraud consumers and charge consumers higher rates for services and products that

19    Defendant does not provide.

20    40.    In reality, Defendant is no more than a communication service and money-handling

21    between merchants, consumers, and Defendant's own contracted drivers while Defendant

22    gouges any and all parties that it possibly can. Defendant is ignorant to reality in that it

23    thinks its consumers have tacitly agreed to aspects of shady practices described in

24    Defendant's Terms, thereby making the practices legally permissible. DoorDash uses

25    these Terms as a shield in shifting financial liability in its indemnification provisions,

26    liability limitations, exculpatory agreements, forced acknowledgements, and its waiver

27    of rights.

28    41.    The results of the above are that DoorDash believes a consumer can only sue in

secret arbitration on an individual basis within six months, and that injunctive relief is an

impossibility in terms of possible relief granted. This belief is incorrect as it is premised on a fundamentally flawed position.

42.     DoorDash believes its Terms represent an actual enforceable contract with consumers. This above belief is wrong for at least three reasons.

    a.     Firstly, DoorDash's contract lacks an offer, acceptance, sufficient consideration, and a meeting of the minds – three basic elements of a contract.

    b.     Secondly, consumers must agree affirmatively to be bound by the Terms which represent a contract of adhesion that waives fundamental rights granted by the United States Constitution (jury trials and access to public courts) and the Federal Rules of Civil Procedure (class and collective actions). But in the behavior at hand, DoorDash has consumers "agree" to a "contract" simply by clicking a button that is designed to allow access to an app, not a button click agreeing to a contract that is designed to strip an individual of rights.

    c.     Thirdly, Defendant's supposed "contract" is inapplicable to children as minors do not have the capability to contract and Defendant's Terms disaffirm any contract with a minor.

43.     Absent an enforceable contract, DoorDash must answer for its fraudulent actions before this Court with respect to DoorDash's delivery fee, priority delivery fee, regulatory fee, expanded range delivery fee, DashPass fee, and hidden marketing and commission fees. All of these aforementioned fees needlessly and fraudulently increase the cost of the service that DoorDash provides.

44.     This lawsuit seeks to end DoorDash's massive fraud on consumers. Plaintiff, for herself and a nationwide and statewide class of individuals, now sue DoorDash for its predatory pricing practices.

45.     In doing so, Plaintiff seeks declaratory and injunctive relief and monetary damages of no less than $1,000,000,000.00 (One Billion Dollars) for all consumers who fell prey to DoorDash's illegal pricing scheme over the past four years.

1

**THE PARTIES**

2    46.    Plaintiff Kameron Masters is a citizen of South Carolina, residing in Easley, South

3           Carolina. Easley is located within Pickens County, South Carolina.

4    47.    Plaintiff Masters is a busy, career-oriented person who often relies on food delivery

5           services, primarily DoorDash. Plaintiff Masters signed up for DoorDash and established

6           an account in her own name, even becoming a premium "DashPass" member, which is

7           an additional program offered by DoorDash that supposedly offers cheaper rates.

8    48.    Plaintiff used the delivery service to place and receive food orders. As such,

9           Plaintiff was charged a misleading, deceptive, falsely increased, and/or fraudulent

10          delivery fee, priority delivery fee, and subscription fee.

11   49.    The vast majority, if not all, of Plaintiff Master's transactions have occurred within

12          South Carolina. When Plaintiff Masters signed up for DoorDash, she did not know of the

13          Terms.

14   50.    Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules

15          of Civil Procedure on behalf of herself and all others similarly situated as defined in later

16          paragraphs of this Complaint.

17   51.    Defendant DoorDash is incorporated in the State of Delaware and has its principal

18          place of business in the State of California. For Diversity purposes, DoorDash is a

19          resident of both states. More specifically, Defendant DoorDash is headquartered in San

20          Francisco, CA. Defendant's headquarters are located at 303 2nd Street, Suite 800, San

21          Francisco, CA 94107.

22   52.    Further, and for more clarity, DoorDash is a technology company that does not

23          prepare or sell food, and thus DoorDash, the DoorDash platform, and its associated

24          technology is not a necessity as it does not prepare or sell food. DoorDash is no more

25          than a middleman that creates a somewhat user friendly nexus between independent

26          contractors that deliver food, restaurants that create and sell the food, and consumers who

27          pay fees for delivery and fees for the food itself. Other than providing the software to

28          communicate, which could be done easily with a simple phone call, DoorDash does

            nothing but sit around and collect money.

53.     DoorDash is a culpable person under the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961 to 1968 ("RICO").

## JURISDICTION AND VENUE

54.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has different citizenship from the Defendant, and the total amount in controversy exceeds $5,000,000.

55.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C.§ 1331 and 18 U.S.C. §§ 1964(a) and (c) because this action involves claims under RICO.

56.     DoorDash is subject to this Court's jurisdiction as DoorDash has its headquarters within this District.

57.     Venue is proper pursuant to 28 U.S.C. 1391(b)(1) as Defendant is a resident of this District.

58.     Divisional Assignment. Assignment to the San Francisco Division is proper as DoorDash's headquarters are in San Francisco. Given the location, a substantial amount of the acts or omissions giving rise to Plaintiff's claims occurred therein.

## COMMON FACTUAL ALLEGATIONS

*DoorDash's Small and Noble Beginnings*

59.     DoorDash began in 2012 as PaloAltoDelivery.com ("Palo Alto Delivery") when four Stanford University students established a website designed to provide delivery services for local restaurants to help them increase sales.

60.     Unlike some other services, Palo Alto Delivery provided its own delivery force so restaurants could outsource deliveries to Palo Alto Delivery rather than develop a delivery arm themselves. Palo Alto Delivery's success quickly attracted investors.

61.     In 2013, Palo Alto Delivery rebranded itself as DoorDash and shifted its focus to developing technology to assist business-to-consumer deliveries in the on-demand delivery market. In a real sense, Palo Alto Delivery went from a small company ran by

college students with its own workforce to a giant tech company that independently contracted out its most essential workers.

62.      On-demand delivery is the process of retailers, restaurants, manufacturers, grocery stores, etc. [. .,] being able to deliver orders quickly and with no advanced notice. On demand services have become particularly popular due to the popularization of the on-demand delivery app, as well as the expansion of eCommerce due to COVID-19."[12]

63.      The on-demand food delivery industry predominately impacts the country's most financially vulnerable populations. A nationwide research study conducted by Zion & Zion reveals the largest user markets for online delivery food services are the young and the poor.[13]

64.      The on-demand delivery market represents a significant part of the gig economy. As one source explains, the "gig economy is a labor market that relies heavily on temporary and part-time positions filled by independent contractors and freelancers rather than full-time permanent employees. Gig workers gain flexibility and independence but little or no job security. Many employers save money by avoiding paying benefits such as health coverage and paid vacation time...... [T]he flexibility of working gigs can actually disrupt the work-life balance, sleep patterns, and activities of daily life. Flexibility in a gig economy often means that workers have to make themselves available any time gigs come up, regardless of their other needs, and must always be on

---

12. Zahava Dalin-Kaptzan, *On-Demand Delivery: 7 Fundamentals of Fast, Competitive Delivery*, BRINGG, https://www.bringg.com/blog/delivery/the-on-demand-delivery-experience/ (last visited May 3, 2023).

13. Aric Zion & Thomas Hollman, *Food Delivery Apps: Usage and Demographic — Winners, Losers and Laggards*, ZION & ZION (2019), https://www.zionandzion.com/research/ food-delivery-apps-usage-and-demographics-winners-losers-and-laggards/.

the hunt for the next gig. Competition for gigs has increased, too. And unemployment insurance usually doesn't cover gig workers who can't find employment."[14]

65.    DoorDash plays a significant role in the gig economy by using its non-employee independent contractors (hereinafter "Dashers") to perform deliveries.

*DoorDash's Exponential Growth*

66.    Over the past ten years, the on-demand food delivery market enjoyed steady revenue increases before exploding in popularity during the pandemic starting in 2020.

67.    In 2018, the on-demand food delivery market represented a healthy $82 billion in gross revenues but is now projected to exceed $200 billion by 2025.[15] The growth in this market has been rapid and DoorDash experienced a similar rapid growth. But as explained herein, DoorDash's tremendous growth in the pursuit of more revenue occurred on the backs of restaurants, contractors, and especially consumers through a multitude of fraudulent business practices and strategies.

68.    By late 2018, DoorDash had overtaken Uber Eats as the country's number two delivery service and was closing fast on then-number one GrubHub.[16] By September of 2019, DoorDash controlled thirty-five percent of the on-demand food delivery market in

---

14. The Investopedia Team, *Gig Economy: Definition, Factors Behind It, Critique & Gig Work*, INVESTOPEDIA (Oct. 1, 2022), https://www.investopedia.com/terms/g/gig-economy.asp.

15. *$9.6 Billion in Investments Spurring Aggressive Expansion of Food Delivery Companies*, FROST & SULLIVAN (Oct. 25, 2019), https://www.frost.com/news/press-releases/9-6- billion-in-investments-spurring-aggressive-expansion-of-food-delivery-companies/.

16. Alison Griswold, *DoorDash has overtaken Uber Eats in US online food delivery*, QUARTZ (Feb. 14, 2019), https://qz.com/1549084/doordash-overtook-uber-eats-in-us-online- food-delivery-second-measure-finds.

CLASS ACTION COMPLAINT              14

the United States.[17] With the start of the pandemic in 2020 and the resulting economic crisis, DoorDash's deceptive business practices spurred its growth. By March 2022, the company had more than fifty-nine percent of the monthly market.[18] Less than a year later, by February 2023, DoorDash's monthly market share had climbed to 65%, as the illustrations below reflect.[19]





---

17. Frank Holland & J.R. Reed, *DoorDash continues to lead in the food delivery wars*, CNBC (Nov. 25, 2019, 9:43 AM EST), https://www.cnbc.com/2019/11/21/doordash-continues- to-lead-in-the-food-delivery-wars.html.

18. Tom Kaiser, *U.S. Delivery Sales, DoorDash Share Still Growing*, FOOD ON DEMAND (Apr. 28, 2022), https://foodondemand.com/04282022/u-s-delivery-sales-doordash-share-still-growing/.

19. Janine Perri, *Which company is winning the restaurant delivery war?*, BLOOMBERG SECOND MEASURE (Apr. 14, 2023), https://secondmeasure.com/datapoints/food-delivery- services-grubhub-uber-eats-doordash-postmates/.

69.      In December 2020, DoorDash's initial public offering raised $3.37 billion and gave DoorDash a valuation exceeding $70 billion.[20] The IPO made billionaires out of DoorDash founders, Tony Xu, Andy Fang, and Stanley Tang.

70.      During 2020 and 2021, at the height of the COVID-19 pandemic, DoorDash's revenue grew significantly. DoorDash had $2.9 billion in revenue in 2020, which skyrocketed to $4.9 billion in 2021. DoorDash's trend of significantly higher year-over-year revenue and gross order value continued through 2022, reaching $6.6 billion.[21]

71.      In 2021, DoorDash had 25 million active users, most of them in the United States, an increase of twenty-five percent over 2020. DoorDash reported delivering 1.4 billion orders in 2021, which grew to 1.7 billion orders in 2022.[22] As of 2022, DoorDash had about 450,000 active monthly merchants,[23] and about 25 million active monthly consumers using its platform. Now, with an estimated 32 million users of its technology,[24] DoorDash serves about 10% of the entire United States population.

*DoorDash's Transformation from Humble Start-Up to Corrupt Corporation*

72.      As DoorDash's market share grew so did its willingness to engage in unsavory business practices towards the drivers, merchants, and consumers who use the DoorDash Platform. Beyond the issues discussed previously herein (namely, DoorDash improperly

---

20. Erin Griffith, *DoorDash Soars in First Day of Trading*, N.Y. TIMES (Mar. 19, 2021), https://www.nytimes.com/2020/12/09/technology/doordash-ipo-stock.html?smid=url-share.

21. Daniela Coppola, *Annual revenue of DoorDash from 2019 to 2022*, STATISTA (Mar. 22, 2023), https://www.statista.com/statistics/1294498/doordash-annual-revenue/

22. Gennaro Cuofano, *DoorDash Orders*, FOURWEEKMBA (Feb. 20, 2023), https://fourweekmba.com/doordash-orders/.

23. Brian Dean, *How Many People Use DoorDash in 2023? [New Data]*, BACKLINKO (Mar. 27, 2023), https://backlinko.com/doordash-users.

24. David Curry, *DoorDash Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (May 2, 2023), https://www.businessofapps.com/data/doordash-statistics/.

retained tips; forced struggling gig drivers to pay fees to receive their own money; leveraged or extorted drivers to participate in programs designed to generate more revenue for DoorDash; and was sued by Chicago for marking-up menu items, violating the City's pandemic-related cap on food delivery fees, and misleading consumers on the nature of fees),[25] DoorDash's short history is full of more dubious conduct.

73.     Former or current Dashers and gig workers complain about DoorDash misleading the public about Dashers' earnings through social media marketing campaigns on TikTok.[26] In other words, like its actions with consumers, DoorDash has a habit of inducing people to engage with its platform based on misrepresentations.

74.     Even after a $100 million settlement of a class action alleging that DoorDash misclassified its Dashers in Massachusetts and California as independent contractors rather than employees,[27] DoorDash continues to face suit in multiple jurisdictions under the Fair Labor Standards Act and state equivalents for misclassifying their drivers, including recently in the United States District Court for the Middle District of Florida, *Silva v. DoorDash*, No. 6:23-cv- 00104.

75.     In these cases, DoorDash moved to compel arbitration. But when sued by nearly 6,000 current or former Dashers in a mass arbitration over the classification of its drivers, DoorDash sought to avoid its own contractual arbitration provision by litigating in court.[28]

---

25. *Id.*

26. Driven Wyld, *DoorDash Driver EXPOSES Company for False Advertising! The Harsh Truth! UberEats Grubhub Instacart*, YOUTUBE (Apr. 13, 2023), https://youtu.be/cnam6bA3nc4.

27. Informational website for the settlement of wage and hour claims of DoorDash California and Massachusetts Drivers, https://www.doordashclasssettlement.com/ (last visited May 3, 2023).

28. *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062 (N.D. Cal. 2020).

76.     Regardless of the forum, in each case DoorDash still stressed that it is not a delivery company and does not control its drivers because of its independent contractor model.

77.     DoorDash has been sued for using the trade dress—names, logos, trademarks, and other intellectual property—of various restaurants without permission to create the appearance to consumers that its restaurant offerings are more robust.

78.     DoorDash was sued for false advertising reportedly for falsely listing a mom-and-pop restaurant struggling during the pandemic as "closed" or "unavailable" on its platform. That restaurant contends in a class action that "DoorDash deceptively directed customers away from restaurants that refuse[d] to pay up to a 30% commission for each DoorDash delivery."[29]

79.     DoorDash has been sued because its Dashers have harmed people, including a Dasher who killed at least one person when the driver crashed while reading a DoorDash communication.[30] DoorDash once again disputed liability for the Dashers' actions because the Dasher is an independent contractor, not a DoorDash employee.

80.     Of course, when confronted with its misdeeds DoorDash reverts to the standard corporate playbook of emphasizing its philanthropic efforts. In many respects these efforts are contrived and minimal compared to DoorDash's gross revenues. For example, when facing negative press over the strong-arm tactics that it used on restaurants during the pandemic, DoorDash developed an advertising campaign that highlighted its role helping restaurants survive during the pandemic, particularly restaurants owned by

---

29. Nicholas Iovino, *DoorDash Can't Duck Restaurant's False Advertising Suit*, COURTHOUSE NEWS SERVICE (Jan. 19, 2021), https://www.courthousenews.com/doordash-cant-duck-restaurants-false-advertising-suit/.

30. Emilie Raguso, *Motorist who killed pedestrian was driving for DoorDash, lawsuit says*, BERKELEYSIDE (Aug. 31, 2021, 4:29 PM), https://www.berkeleyside.org/2021/08/31/ motorist-killed-pedestrian-berkeley-doordash-lawsuit.

people of color.31 While DoorDash likes to play up its "good citizen" image, its history is far less rosy.

81.     Frustrated with DoorDash's pricing approach, several states and municipalities have adopted legislation regulating how DoorDash charges restaurants. But DoorDash's questionable business practices with restaurants pale in comparison to DoorDash's actions towards consumers, like Plaintiff. To that end, Congress has begun investigating DoorDash and others for their consumer pricing practices.32

**HOW DOORDASH WORKS**

82.     DoorDash is "an online marketplace platform using web-based technology that connects contractors, restaurants and/or other businesses, and consumers [  ]. [DoorDash]'s software permits registered users to place orders for food and/or other goods and services from various restaurants and businesses. Once such orders are made, [DoorDash's] software notifies [a network of independent] contractors that a Delivery Opportunity is available and the [DoorDash] software facilitates completion of the delivery."33

83.     In other words, DoorDash uses text messaging, and emails communications extensively as part of its delivery scheme. Each of the contractors, restaurants, and

---

31. *SOUTHSIDE MAGNOLIA*, YOUTUBE (Oct. 26, 2020), https://www.youtube.com/watch?v=Q42SPkzI3Dw; s*ee also* DoorDash, *Soul of the City*, YOUTUBE (June 15, 2021), https://youtu.be/aCriukDwvI4.

32. Cristiano Lima, *Democrats press Grubhub, DoorDash and Uber on their use of 'junk fees'*, WASH. POST (Feb. 21, 2023, 9:16 AM EST), https://www.washingtonpost.com/politics/2023/02/21/democrats-press-grubhub-doordash-uber-their-use-junk-fees/.

33. *Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Apr. 14, 2023), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en- US (citing recitals).

consumers receive such electronic communications. *See* illustration describing operations below.:[34]



84.     Consumers, including minor children, who want to have food or other goods delivered anywhere – whether to their home, office, hotel, ballpark, or school – access DoorDash in either of two ways: (1) through its website, www.doordash.com, or (2) through the DoorDash App, which is available either through the Apple App Store or Google Play. The registration process to create a DoorDash account on both its website and the DoorDash App (collectively the "DoorDash Platform") has slightly varied over the years in terms of what consumers see. But the DoorDash Platform presents a virtually identical user experience when registering to use the DoorDash technology.

85.     Regardless of when one registers while interacting with the platform, or the method one used to create their account, DoorDash always has placed a purported notice of its intent to contract with consumers in a cluttered environment and/or in an inconspicuous manner. The DoorDash registration experience allows consumers to neither manifest an assent to contract nor waive fundamental rights knowingly and intelligently.

_Signing Up For DoorDash_

34. Holly Jin et al., *Next-Generation Optimization for Dasher Dispatch at DoorDash*, DOORDASH ENGINEERING (Feb. 28, 2020), https://doordash.engineering/2020/02/28/next-generation-optimization-for-dasher-dispatch-at-doordash/.

86.     Logging onto www.doordash.com, a user sees a delivery address sign-in box in the center top of the home page and a "sign in" tab for returning customers or "sign up" tab for new customers in the upper right-hand corner of the page. Either the address box or sign-in/up tabs will allow a user to begin the process of accessing the platform. *See* illustration below:



87.     If the first-time user clicks on "sign up," a prompt appears that is cluttered with visuals. While requesting basic personal information, DoorDash includes six large, gray boxes with writing in each indicating that the user should input the user's first and last name, an email address, a telephone number, and a password. These boxes take up significant space. The sign-up prompt includes four large, colorful tabs reading "sign up" or continue with Google, Facebook, or Apple. There are no prompts or fields requesting that the user verify his or her age. Nor does the website tell consumers to read the Terms or indicate that registering or otherwise using the website platform binds consumers or creates a contract that incorporates waivers of important rights. After completing the requested information, a first-time user clicks on "sign up" and that user is now registered. But presently located above the large, red sign-up button (in smaller, less prominent font) and squeezed in between the large box requesting a password, is inconspicuous language that reads: "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,'" you agree to DoorDash's Terms and Conditions and Privacy Policy." Surrounding the registration process are graphics of food and restaurants and

additional words that command attention. DoorDash has used various iterations of this

registration form since 2019. *See* illustration below:



88.     Upon information and belief, as recently as several months ago in January 2023,

and from time-to-time over the last four years, that same (less prominent) language was

buried at the bottom of the sign-up prompt obscured by other large registration icons for

Google, Facebook and/or Apple. *See* below:



89.     If a first-time user scrolls down the home page without providing an address or signing-in or signing-up, that user can learn about becoming a Dasher, a partner restaurant, or downloading the DoorDash App. *See* illustration below:



90.     Scrolling down the home page further, the user can find restaurants. *See* illustration below:



91.     Clicking the "find restaurant" tab will take the user to a "Restaurants near me" landing page. Upon information and belief, the website uses location information embedded in the user's computer or mobile device to identify nearby restaurants. The

sign-in and sign-up buttons remain in the upper right-hand corner and an "enter delivery address" field is on the upper left-hand side. *See* illustration below:



92.    If a user clicks on a specific restaurant, like Shake Shack for example, a new page loads forcing the user to enter an address for delivery. *See* illustration below:



93.    When a user enters an address, a new page will load informing the user whether the identified restaurant is within the restaurant's delivery area. If the address is outside the restaurant's delivery area, the user is given the option to change the address, change the order to pick-up or view other nearby restaurants.[38] *See* illustration below:



94.    Selecting "view other nearby restaurants" allows the user to pursue a variety of locations by specific food type and other categories of organization in what is called the DoorDash marketplace. *See* illustration below:



95.    A user can then select a specific restaurant to view its menu and select a food item to add to the cart. *See* illustration below:

1
2
3
4
5
6
7
8
9
10
11
12



13   96.     Once the menu item is added, a user can select "checkout" in the upper right-hand
14          corner of the page. *See* illustration below.

15
16



17
18
19
20
21
22
23
24

25   97.     Selecting checkout takes a user to a page on which the user can add a payment
26          method in the upper right-hand corner, or sign up, sign-in, or proceed with an email
27          address in the center. Nowhere on this page is there any reference to Terms and
28          Conditions or any notice that by continuing the user assents to a contract with DoorDash.
           *See* illustration below:

CLASS ACTION COMPLAINT          26



98.    When a first-time user enters an email address a prompt appears instructing the individual to "sign-in" to an existing account or "sign up" or "create an account" to use DoorDash. The Terms and Conditions are not referenced on this page. *See* illustration below:



99.    By clicking "create an account" or "sign up," the first-time user is taken to a registration page (like the sign-up prompt one sees when selecting sign-up on the home page after logging onto doordash.com). Upon information and belief, the above-described process has been substantially similar since 2019.

100.     This registration page seeks the same basic personal information in the same format, i.e., large, gray boxes requesting the user's first and last name, an email address (which is already populated), a telephone number, and a password. The registration page also allows the user to continue creating an account the sign-up process through Google, Facebook, or Apple. Nowhere on the page is there any language that registering to form an account on DoorDash creates a contract or waives rights. But the consumer's pending order is reflected to the right of the sign-up area (almost like a reminder to hurry up and complete the process). And above the red sign-up button, in smaller font, is language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' a user agrees to DoorDash's Terms and Conditions and Privacy Policy." See below:



*Signing Up For DoorDash Via The DoorDash App*

101.     A user can access the DoorDash App by downloading it from the Play Store, Apple Store, or from DoorDash's website. Once the app is downloaded and opened, users on either the IOS/Apple or Android/Samsung mobile platforms have engaged in virtually identical registration experiences since 2019.

102.     The user is met with a screen cluttered by food graphics, advertisement slogans, and different (albeit large and colorful) registration tabs. In effect, a returning user can sign into the DoorDash App, and a first-time user is able to create an account or continue

as a guest. For IOS/Apple and Android/Samsung mobile platforms, language on the app's initial landing screen in smaller font near the bottom of the page and obscured by much larger colorful icons reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' a user agrees to DoorDash's Terms and Conditions and Privacy Policy." Assuming consumers look at the bottom of the screen instead of pressing a tab, the words "Terms and Conditions and Privacy Policy" appear in an even smaller font on the IOS/Apple platform. There is no language on this page urging consumers to read the Terms and Condition or warning them that creating an account on the DoorDash App binds consumers contractually and subjects them to arbitration, waiving fundamental rights. *See* illustrations below, depicting Apple/IOS/iPhone on the Left with Samsung/Android on the right:



103.    Since 2019, if a returning user selects "Continue with Google, Facebook, or Apple" as an alternative method of signing-into DoorDash, that returning user will be connected to an existing DoorDash account through that user's account on Google, Facebook, or Apple.

104.    If a first-time user selects "Continue with Google, Facebook, or Apple" as an alternative method to sign up for DoorDash, that first-time user will receive a prompt allowing that user to sign up with an account on Google, Facebook, or Apple. The prompt includes language at the bottom that generally states that the first-time user "can review DoorDash's privacy policy and terms of service." The prompt does not inform the first-

time user that he or she must "agree" to (let alone be "bound" by) DoorDash's "terms of service," which is a misnomer for its Terms. *See* illustrations below using Google and Apple as alternative methods for registering on the DoorDash Platform. See below, with Android on the left and Apple on the right.




105.     If the user selects continue with email as reflected in the illustrations at paragraph above, a sign-in/sign up screen will appear. Toggling to sign up, a user is presented with yet another cluttered registration screen. From time to time, the screen will include advertisements, like a colorful banner urging the user to sign up for a 40% discount. The screen also requests the same personal information (consisting of the user's first and last name, an email address, a telephone number, and a password) in large grey boxes with wording that describes the nature of the information requested. The registration prompt also includes large, colorful tabs that allow the user to proceed "by tapping" the red "sign up" button or tapping buttons to "continue with Google, Facebook, or Apple." There are no prompts or fields requesting that the user verify his or her age or even acknowledge

that the user is over 18 years old. Nor does the app have any language that urges consumers to read the Terms, or that informs consumers that registering or creating an account on the DoorDash App binds them contractually and subjects them to arbitration, waiving fundamental rights. But sandwiched between the large red sign-up button and the large grey password box is the same, less prominent language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' you agree to DoorDash's Terms and Conditions and Privacy Policy." *See* illustration below.



106.     Upon information and belief, since 2019, DoorDash has located this same or similar notice language in different places previously, including at the bottom of the page beneath other large sign-up icons. DoorDash moved the location of the language earlier this year.

107.     If the user continues as a guest, the user will be prompted to provide an address and then is allowed to browse restaurants, select menu options to be added to the cart, and then can proceed to checkout. Before continuing to check out, however, the app prompts the guest user to create an account with the same sign-up requirements as those launched from the initial screen when opening the DoorDash App and selecting sign up. *See* illustrations below:



108.          The DoorDash Platform does not include the Terms as a category in the information menu located in the upper-left corner of the page. *See* illustrations below:



109.        And the DoorDash Platform buries the Terms at the bottom of a lengthy list of shopping options. Even without selecting the "More" tab to reveal more restaurant options, a user must scroll through ten screens before the Terms appear. Even then, DoorDash stealthily displays them in a much smaller font which is neither highlighted, underlined, nor presented in a different color. *See* illustrations below:



**Using DoorDash**

*Placing Orders*

110.        After signing up, a consumer may place orders on DoorDash. Whether using the DoorDash website or on the DoorDash App, the user experience is virtually the same and has been that way since 2019. The intuitive nature of DoorDash's technology makes it easy to use.

111.        After launching the app or website, consumers are presented with categories of merchants and below that types of food in the DoorDash marketplace. By scrolling down the page, a consumer can see restaurants and merchants organized under various categories such as "Nearby" or "Wallet Friendly" or "Try Something New." *See* illustration below:

1
2
3
4
5
6
7
8
9



10    112.    To place an order, a consumer need only select a restaurant, like Chick-fil-A, and

11    then browse its menu, scrolling down the page to view the various items and then tapping

12    the menu items and adding them to the cart. The consumer continues adding to the cart

13    until the order is complete, at which point the consumer views the cart screen to see a

14    populated list of its contents. Scrolling to the bottom of the cart screen, the consumer can

15    see a summary of charges which typically consist of a subtotal for food, a delivery fee, a

16    service fee, and taxes. When completed, a consumer presses continue, which will take

17    the consumer to a screen with delivery time options (which include express, standard, or

18    scheduled). The delivery time window advertises the length of time for the order to reach

19    the consumer. Scrolling further down the page, a consumer can review his or her contact

20    information, instructions on delivery, and a summary of the order costs. *See* illustrations

21    below.

22
23
24
25
26
27



28

113.    After selecting the delivery window, and confirming the contact information, a consumer can click the "next" button to proceed with entering your payment method and eventually placing the order.

*Payment Methods*

114.    As for payment methods, DoorDash reserves a section above the place order button for consumer payment methods. When a user clicks on that section, the DoorDash Platform reveals the various accepted payment methods. DoorDash takes virtually all forms of electronic payments. A consumer can add a credit card, Google or Apple Pay, Venmo, PayPal, gift cards, or debit cards. *See* illustrations below.




115.    As DoorDash knows, the wide range of payment methods makes it easy for consumers of all ages to place and pay for orders on DoorDash, given the proliferation of parent-loaded debit cards like Greenlight and the ability to use gift cards. The varying electronic payment methods do not impact the user experience on the DoorDash Platform. DoorDash maintains all consumer order information. The payment method (credit or debit card number) provides DoorDash with insight into the type of consumer placing an order.

*Order Status Communications*

116.    After selecting the time, clicking next, and entering the payment method, a consumer can click place the order to complete the order. Once done, the consumer receives a summary of the order (including the cost of the food, each line-item fee,

estimated tax, and the Dasher's tip – which DoorDash will extort, which the consumer can select). Near the bottom of the screen above the "Place Order" button, a consumer can enter his or her payment methodology. As soon as the "Place Order" button is touched, the screen shows the real delivery time which is usually different from the advertised delivery time, and the user can again click to view all details of the order or add items to the order from another store. *See* illustrations below:



117.    DoorDash then sends a series of text messages and/or emails showing each stage of the order until it is delivered.

*DoorDash's Use of The USPS*

118.    In promoting its platform, DoorDash uses the United States Postal Service and other mail services to send solicitations to consumers, like Plaintiff, that provide discounts on DoorDash's service and advertisement about its offerings, see below.[35]



---

35 Gennaro Cuofano, *DoorDash GOV*, FOURWEEKMBA (Feb. 20, 2023), https://fourweekmba.com/doordash-gov/.

1

2

3

4

5     119.     DoorDash uses the mail so frequently that some websites offer services to stop

6     DoorDash's direct mail marketing.[36] *See* illustration below.



14    120.     DoorDash's technology operates on sophisticated engineering for everything it

15    does. In describing this work, DoorDash says it "is rapidly growing a logistics platform

16    that enables millions of orders a day globally, and none of it would be possible without

17    our world-class engineering team."[37] DoorDash advertises its engineering as driving its

18    "high impact projects that power our velocity, reliability, and innovation." DoorDash

19    even advises merchant restaurants how to perform "menu engineering" with respect to

20    their prices.[38]

21

22

23    _____

24    36 *How to Stop Mail from DoorDash*, PAPERKARMA, https://www.paperkarma.com/stop-

25    junk-mail/doordash/ (last visited May 3, 2023).

26    37 DOORDASH ENGINEERING, https://doordash.engineering/ (last visited May 3, 2023).

27

28    38 Engineering Blog, DOORDASH ENGINEERING, https://doordash.engineering/blog/ (last

visited May 3, 2023).

CLASS ACTION COMPLAINT                    37

121.     Upon information and belief, DoorDash routinely advises restaurants and merchants to increase their prices for menu items available for delivery. The heart of DoorDash's engineering rests on proprietary algorithms: "At DoorDash, route optimization is a key component of our dispatch system, known internally as <u>DeepRed</u>. The routing algorithm design we chose – based on the <u>ruin-and-recreate principle</u> – helped us to scale to meet the increased demand."[39]

122.     DoorDash says:  "Route optimization is a computationally intensive process. Solving this problem for last-mile logistics introduces additional complexity because a multitude of orders must be delivered same-day under a range of constraints, including varying delivery windows, vehicle capacity, speed, and Dasher, our name for delivery drivers, availability."[40]

123.     Further, DoorDash states: "Fortunately, DoorDash's team was able to quickly replace its manual, ops-driven solution with a more automated one that could handle th[e] increased demand..."[41]

124.     In other words, DoorDash's system is subject to its manipulation given the varying inputs underlying the algorithms.

125.     Hidden in the frequently asked questions section of its website, DoorDash discloses "[t]here is not a standard delivery radius for merchants on DoorDash. The delivery radius is *__set by an algorithm__* based on how many Dashers are in your area and consumer demand. Plus and Premium members do get access to a larger delivery

---

[39] Sara DeForest, *How to Improve Your Restaurant Profit Margin*, DOORDASH FOR MERCHANTS (Feb. 23, 2023), https://get.doordash.com/en-us/blog/restaurant-profit-margin.

[40] Ben Katz, *Scaling a routing algorithm using multithreading and ruin-and-recreate*, DOORDASH ENGINEERING (Nov. 30, 2021), https://doordash.engineering/2021/11/30/scaling-a-routing-algorithm-using-multithreading-and-ruin-and-recreate/.

[41] *Id.*

area than Basic, potentially reaching more customers."[42] In other words, DoorDash manipulates service areas based on algorithmic data.

126.    Despite its optimization efforts, DoorDash's "real-time delivery logistics system, the environment, behavior of Dashers ([its] term for delivery drivers), and consumer demand are highly volatile. Because small changes to the decision-making process of matching deliveries to Dashers can cause a cascade of different assignment decisions, it is difficult to determine the expected outcome of any algorithm iteration or product change. All of this makes it hard to determine the impact of any change via offline sizing or analysis."[43] In other words, DoorDash cannot promise anything with respect to how or when a Dasher will make a delivery.

127.    But DoorDash pays close attention to the "small changes to the decision-making process," especially for consumers. DoorDash closely studies consumer habits to determine the best way to "sell" (some might say exploit) them on their habits. To this end, DoorDash conducts consumer surveys[44] and even generates annual reports[45] providing detailed analysis insight into consumer habits. Upon information and belief,

---

42 *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023) (emphasis added).

43 Sifeng Lin & Yixin Tang, *The 4 Principles DoorDash Used to Increase Its Logistics Experiment Capacity by 1000%*, DOORDASH ENGINEERING (Sept. 21, 2021), https://doordash.engineering/2021/09/21/the-4-principles-doordash-used-to-increase-its-logistics-experiment-capacity-by-1000/.

44 Allison Van Duyne, *2022 Consumer Trends in the Restaurant Industry*, DOORDASH FOR MERCHANTS (May 23, 2022), https://get.doordash.com/en-us/blog/online-ordering-habits.

45 *2022 Restaurant Online Ordering Trends, DoorDash for Merchants*, DOORDASH FOR MERCHANTS (July 21, 2022), https://get.doordash.com/en-us/resources/restaurant-online-ordering-trends.

CLASS ACTION COMPLAINT                    39

DoorDash "engineers" its platform to optimize sales based on consumer habits even at the sake of transparency, accuracy, or legal compliance.

## DOORDASH'S TERMS AND CONDITIONS

128.     DoorDash's Terms, dated April 28, 2023, are 27 standard pages of complex legalese. Since 2019, DoorDash has had more than a dozen different versions of its Terms and Conditions with each having numerous pages of complex legal concepts. For a multitude of factual and legal reasons, the Terms are unenforceable. Even a cursory review of the current Terms demonstrates their oppressive nature.

129.     As a threshold matter, paragraph 2 of the Terms read: "If you access any of our websites located at https://www.doordash.com/ . . . install or use the DoorDash or Caviar mobile application, install or use any other technology supplied by DoorDash (collectively, the "Technology"), or access or use any information, function, feature, or service made available or enabled by DoorDash (collectively, the "Services," which includes the Technology), click or tap a button or take similar action to signify your affirmative acceptance of this Agreement, or complete the DoorDash account registration process, you, your heirs, assigns, and successors (collectively, "you" or "your") hereby represent and warrant that: (a) *you have read, understand, and agree to be bound by this Agreement and any future amendments and additions to this Agreement* as published from time to time at https://www.doordash.com/terms/ or through the Technology. . ."[46]

130.     In other words, DoorDash only informs consumers in the Terms that the consumer should read them and that completing the registration process purportedly binds consumers to a contract of adhesion that waives and limits important rights.

---

46 *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 2 (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US  (emphasis added).

131.    Upon information and belief, because DoorDash believes consumers have agreed to future amendments of the Terms, DoorDash does not inform consumers when they change or amended them.

132.    Thus, under DoorDash's purported contract, consumers' initial registration on the platform represents their assent to any contract terms DoorDash chooses without any further notice to or agreement from the consumer.

133.    Paragraph 6 of the Terms assert strategic acknowledgments, like:

"You acknowledge and agree that DoorDash is not a merchant, retailer, restaurant, grocer, pharmacy, chemist, delivery service, or food preparation business, and has no responsibility or liability for the acts or omissions of any Merchant or any Contractor. Merchants are the retailers of the products or services offered through the Services. DoorDash is not in the delivery business, does not provide delivery services, and is not a common carrier. DoorDash provides the Services to facilitate the transmission of orders by Users to Merchants, including orders for pickup or delivery by Contractors and/or Merchants."[47]

134.    The Terms and Conditions provide quasi-indemnification language in paragraph 7, stating, in relevant part, that:

"You are the sole authorized User of any account you create through the Services. You are solely and fully responsible for all activities that occur under your password or account. You agree that you shall monitor your account to prevent use by minors, and you will accept full responsibility for any unauthorized use of your password or your account."[48]

135.    Specific indemnification language is included in paragraph 18 of the Terms in which DoorDash seeks consumers to indemnify DoorDash for all claims and expenses.

---

47 *Id.* ¶ 6(a).

48 *Id.* ¶ 7.

These sections purport to hold the consumer liable for any damage caused by their use of DoorDash.

136.     In paragraph 12 of the Terms, DoorDash mentions part of its false pricing scheme, including:

**"Prices & Charges.** You understand that: (i) the prices for menu or other items displayed through the Services may differ from the prices offered or published by Merchants for the same menu or other items and/or from prices available at third- party websites and that such prices may not be the lowest prices at which the menu or other items are sold and may change at any time without notice; (ii) DoorDash has no obligation to itemize its costs, profits, or margins when publishing such prices; and (iii) pricing may change at any time, in the discretion of DoorDash or the Merchant (depending on which party sets the given price). . . ."

**"Strikethrough Pricing (United States Orders).** This Section 12(b) applies to United States Orders. DoorDash may use strikethrough pricing for certain items (for example, when presenting a discount or promotional price for items). DoorDash does not represent that the strikethrough price was the regular or former price of items for any particular period of time and the time period may vary widely depending on the items. DoorDash may also rely on Merchants or a third party to provide information about the regular or former price of items offered by those Merchants or a third party, and DoorDash's strikethrough price therefore may represent the price that DoorDash, a Merchant, or a third party offered the item for sale for some period of time. The strikethrough price may also be an introductory price that was offered for a short period of time. Unless otherwise specified, the strike-through price represents a non-member discount to the extent the Merchant has a membership program. . . ."

137.     These paragraphs are deceptive because, by adding the language, "the time period may vary widely," DoorDash misleads consumers into believing pricing is a function of the point in time that a price is offered rather than being a function of DoorDash's engineered pricing model. Here, DoorDash concedes it may "set the given price" on its platform.

138.    But neither of these paragraphs nor any other provision in the Terms disclose DoorDash will charge consumers different prices for the same items or service without any true standard or base price; that DoorDash will charge consumers <u>more than</u> an advertised strikethrough price and/or fee; and that DoorDash will use strikethrough pricing when misrepresenting DashPass savings. Nor do these paragraphs, or any other provision in the Terms, disclose that DoorDash uses deceptive partition pricing, drip pricing, price discrimination, and dark patterns as part of its bait-and-switch advertising scheme.

139.    Partition and Drip pricing is best defined as follows: Partition pricing is dividing the full price of services into parts and drip pricing is promoting only a portion of a service cost upfront, revealing the rest only as consumers navigate and complete the buying process.

140.    Also, in paragraph 12 of the Terms, DoorDash states:

"(e) **Fees for Services.** DoorDash may change the fees that DoorDash charges you as we deem necessary or appropriate for our business, including but not limited to Delivery Fees, Service Fees, Small Order Fees, Expanded Range Fees, Regulatory Response Fees, and Surge Fees. DoorDash may offer different pricing to customers based on a variety of factors, including but not limited to geographic areas or usage. DoorDash may also charge you additional fees as required by law. Further, DoorDash may charge Merchants fees on orders that you place through the Services, including commissions and other fees, and may change those Merchant fees as we deem necessary or appropriate for our business or to comply with applicable law. DoorDash may charge you a Service Fee for the convenience of ordering through the DoorDash Platform."[49]

141.    Neither this paragraph nor any other paragraph in the Terms discloses DoorDash's false advertising scheme relating to fees and food costs, including but not limited to DoorDash's decision to charge delivery fees unrelated to delivery, distance, or time and

---

[49] *Id.* ¶ 12(e).

based on undisclosed "other factors" that consumers never know; that DoorDash misleads consumers into believing they are charged delivery fees and other fees (besides taxes) "as required by law"; and that DoorDash charges consumers for hidden marketing fees and commissions, misleading consumers into believing that merchants pay these costs.

142.     In paragraph 13 of the Terms, DoorDash addresses its DashPass scheme, noting "DashPass Benefits include reduced fees for United States Orders" only while DashPass is "$0 delivery fees for Australia Orders and New Zealand Orders."[50] The Terms also note that "Service Fees and other fees may apply. [DoorDash] reserve[s] the right to add and modify fees that may apply to your DashPass orders."[51]

143.     Finally, the Terms note: "AT THE TIME OF RENEWAL, DOORDASH WILL AUTOMATICALLY CHARGE THE THEN-CURRENT DASHPASS FEE AND ANY APPLICABLE TAXES TO AN ELIGIBLE PAYMENT METHOD THAT WE HAVE ON FILE FOR YOU. If your payment details change, your card provider may provide us with updated payment details. We may use these new details or details from other payment methods on file in order to help prevent any interruption to your DashPass subscription. This includes our right to charge any payment method on file if your initial form of preferred payment fails."[52]

144.     In other words, DoorDash suggests that it can charge U.S. consumers whatever fees it would like under the DashPass and that DoorDash will continue to charge consumers for DashPass on any payment method available until and unless the consumer cancels the DashPass subscription.

145.     Paragraph 14 of the Terms (which has twelve subparts) is a forum selection provision that purports to require that all claims arising out of the Terms and Conditions

---

[50] *Id.* ¶ 12(e).

[51] *Id.*

[52] *Id.*

be subject to arbitration; that purports to waive a jury trial; that purports to ban public injunctive relief; and that purports to ban class action lawsuits.

146.     The Terms also incorporate an attempted limitation of liability, that purportedly caps DoorDash's liability at "the greater of amounts actually paid by and/or due from you to DoorDash in the six (6) month period immediately preceding the event giving rise to such claim" and to exclude "any indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind").[53]

147.     Since 2019, DoorDash's Terms have been a contract of adhesion. The Terms and Conditions are a form or standardized contract that is prepared and offered by DoorDash for its benefit. DoorDash created its Terms with disproportionate bargaining power over consumers, like Plaintiff, who could not, cannot, and did not negotiate any terms, let alone understand them. Rather, DoorDash presents its Terms and Conditions on a take-it-or-leave-it basis. Under this approach, consumers only obtain DoorDash's services by acquiescing to the purported form contract.

148.     Moreover, regardless of when they were in use, DoorDash's Terms and Conditions are unreadable for most consumers. The terms rely on technical legal jargon that lay consumers cannot comprehend. The Terms score poorly under the Flesch Reading Ease and Flesch-Kincaid Grade Level testing standards. For example, the language in paragraph 2 of the most recent Terms, using a Flesch Kincaid Calculator of Readability, is rated "college" level. The Flesch Kincaid Readability Calculator rates paragraph 6 of the Terms and Conditions as "college graduate – very difficult to read." DoorDash knows or should know that an overwhelming majority of consumers who read the Terms and Conditions cannot comprehend their significance. See illustration below:

---

53 *Id.* ¶ 21(a).

149.     Consumers, like Plaintiff, do not assent to DoorDash's Terms by continuing to use the platform. And DoorDash's Terms are procedurally and substantively unconscionable.

**DOORDASH'S SIGNUP LANGUAGE LACKS SUFFICIENT NOTICE**

150.     At all relevant times, DoorDash's registration process preys on consumers' natural urge for instant gratification.[54] In doing so, the DoorDash Platform fails to provide actual or constructive notice that consumers enter a binding legal contract under the DoorDash Terms and Conditions (which includes an arbitration agreement) when they create a DoorDash account. Since 2019, DoorDash has used a wrap agreement that provides inadequate notice about the ramifications of registering to use DoorDash. In various iterations, DoorDash has provided a notice that merely states by tapping or by clicking "Sign Up" or by tapping or clicking "Continue with Google, Facebook, or Apple," the user "agrees to DoorDash's Terms and Conditions and Privacy Policy." All variations of this notice fail to create a contract with consumers for a multitude of reasons.

151.     As a threshold matter, the notice appears in a cluttered environment regardless of when the notice is presented in the registration process. In some places surrounding the

_____

54 Courtney E. Ackerman, *What is Instant Gratification? (Definition & Examples)*, POSITIVEPSYCHOLOGY.COM (June 19, 2018), https://positivepsychology.com/instant-gratification/.

notice, DoorDash includes items in your cart, and food graphics and large grey boxes seeking registration information with writing in the boxes (as reflected below). In all places, there are large, colorful tabs with more instructions on what a consumer should do, like "continue with email" or "sign up" or continue with Google, Facebook, or Apple or as a guest. On other pages, DoorDash includes advertisement banners offering significant discounts on "signing up," like 40% off on a consumer's first order. To this extent, DoorDash uses the registration process as an opportunity to market, sell, and rush consumers into registering rather than allowing them to develop an opportunity to discover terms and then knowingly, intelligently, and affirmatively assent to them. *See* illustrations below:



152.     DoorDash adds visual clutter when consumers, like Plaintiff, create an account to distract them from focusing on the small notice language that is either buried at the bottom of the registration screen or sandwiched between competing text in the middle of the screen. DoorDash then diverts consumers' attention to a large red "sign up" tab because, as an industry expert notes, "[f]or the food delivery business, red color is probably the best choice, as it prompts users to do ***the desired impulsive action*** – tapping the "Get" button. White captions are easy-to-read as they are big contrast with the red

color background."[55] As the illustrations in the paragraph above demonstrate, DoorDash employs this manipulative approach, using a large red "sign-up" tab with white colored letters. Consequently, consumers take the impulsive action of registering without seeing any notice, which makes the prominence and content of the notice much more important.

153.      Beyond being placed in a cluttered environment designed to make consumers act impulsively, the notice is inconspicuous. The notice is not prominent in color or size relative to other text and prompts on the screen, making it naturally more difficult to see easily and more likely to overlook. And the location of the notice language renders it inconspicuous.

154.      Upon information and belief, since 2019, DoorDash has located its notice language at various places, including the bottom of its registration page away from and/or beneath the red sign-up button, as reflected in the earlier illustrations. That language remains in that same place today for consumers initially registering with Google, Apple, or Facebook as reflected on the illustrations contained in earlier paragraphs.

155.      Consumers likely never even see that notice because their attention is drawn to, and they impulsively act on, the large colorful registration tabs before arriving at the small, inconspicuously located language at the bottom of the screen.

156.      DoorDash's registration notice is also poorly worded. As a threshold matter, the notice fails to create a definitive offer by informing consumers that DoorDash is providing its technology only if consumers agree to be bound contractually. And DoorDash does not provide clear instructions on a consumer's acceptance by explaining the act of "registering" to create an account will "bind" them to oppressive Terms.

---

[55] Ex. 45, Anastasia Sidoryk, *App Overview: DoorDash on the App Store & Google Play Store*, APP GROWTH BLOG (June 2, 2020), https://splitmetrics.com/blog/app-overview-doordash/ (emphasis added).

157.     Hardly unambiguous, consumers face three implications when seeing DoorDash's sign up notice. First, the notice implies that DoorDash is making them a contractual offer to use its technology. Second, clicking the "sign up" tab means they are registering to create an account. Third and finally, clicking the sign up tab serves as acceptance and consideration to be bound by a contract.

158.     These compound implications do not allow consumers to achieve a meeting of the minds or waive fundamental rights knowingly and intelligently. Nor does the notice advise consumers to read DoorDash's oppressive Terms, as part of ensuring that their registration allows them to manifest assent to contract and waive a right to jury knowingly and intelligently.

159.     Moreover, DoorDash has consistently included a visible line with the word "or" that separates the various registration methodologies. This separation line casts confusion over the entire sign-up structure for consumers, particularly whether the notice applies to all registration methods or the ones above or below the line with the notice. Exacerbating this issue, as reflected in the left illustration below with the cut-off "Continue with Apple" tab, the registration process does not always fit on one screen. *See* illustrations of sample registration pages below:




160.     Of course, DoorDash has known its registration language was deficient because it changed the language recently. Upon information and belief, DoorDash changed the language in or around April 2023. When toggling to sign up, the language now reads: "[b]y registering, you confirm you have read and agree to the Terms and Conditions and Privacy Policy."

161.     But even with this above change, the new notice remains deficient for reasons that include, but are not limited to: (1) its size and color disparity lacks prominence; (2) it is not located conspicuously relative to each of the sign up methods; (3) it does not have a button that reads "register" leaving consumers to interpret whether sign-up and "registering" are the same; (4) it does not mention the impact of "registering" on Google, Facebook, or Apple; (5) it still has the dividing line with the word "or" separating registration methods; and (6) it does not inform consumers they will be "bound" by the Terms and Conditions (which creates a legal obligation), and waives a right to jury. Illustrations below reflect the change in the notice language.

 

CLASS ACTION COMPLAINT                    50

1

2

3

4

5

6

7

8

9

10

11   162.     Other evidence indicates the company knows its consumer wrap agreement is

12       deficient. With its contract for drivers and its merchants, DoorDash insists on using a

13       clickwrap agreement to manifest assent to contract because their enforceability is more

14       definitive. With respect to its contracted drivers, Victor Shao, Director, New Verticals

15       "for DoorDash, provided sworn testimony in April 2022 in a class action, stating:

16       Although the sign up process has varied slightly over time, the following description

17       represents the process. Prospective Dashers undergo a multi-step process in signing up

18       for a Dasher account. On the first sign up screen, prospective Dashers must enter their

19       email address, or, depending on when the Dasher signed up, their email address, phone

20       number and zip code. The first sign up screen notifies the Dasher that they must check a

21       box and/or press a button to continue with the sign up process, and it also states that

22       through the following: "I agree to the **Independent Contractor Agreement** and have

23       read the **Dasher Privacy Policy**.""[56]

24            . . .

25

26   _____

27       56 Decl. of Victor Shao in Support of Def.'s Mot. to Compel Arb., Strike Class Allegations, and

28   Stay Proceedings at ¶ 5, *Mullo v. DoorDash, Inc.*, No. 1:22-CV-02430 (S.D.N.Y. Apr. 8, 2022), ECF No. 12
     (emphasis in original).

"Before creating accounts and agreeing to the [Independent Contractor Agreement], Plaintiffs could click on the hyperlink and scroll through the ICA at their leisure, on their own terms, and to seek the input of an attorney or trusted advisor if they so choose. They could have also chosen to refrain from creating an account. If they elected to proceed, however, they had to first indicate their acceptance of the ICA. Plaintiff Flores had to manifest his consent to the ICA by checking a box and clicking "Sign Up" on the sign up screen ........................................................................................ "[57]

163.    For its merchant relationships, Kathy Zhu, DoorDash's former Senior Director and Associate General Counsel Commercial and Legal Operations, was tasked with commercial contracting. In a client testimonial found at Ironclad.com,[58] Ms. Zhu said: DoorDash "knew we wanted a clickwrap contract" for DoorDash's merchant relationship "to be a lot more precise."[64] She equivocated on DoorDash's consumer contracts stating, "in the B-to-C [business to consumer] world, it's usually ok legally speaking to deal with all of your customers more or less in the same way."[59] "Usually ok legally speaking more or less" is hardly a ringing endorsement from DoorDash's then "contract counsel" about the enforceability of its wrap agreement for consumers. But her equivocation on enforceability is indeed appropriate.

---

57 *Id.* ¶ 11 (emphasis in original).

58 Ironclad is "a Contract Lifecyle Management (CLM) platform that helps business and legal teams manage every aspect of the contracting process." Ex. 47, IRONCLAD, https://ironcladapp.com/about-us/ (last visited May 3, 2023).

59 *Id.*

164.   DoorDash's approach to minimizing the registration process is intentional. As Zhu noted in a separate interview, DoorDash's priority is "speed" and "efficiency."[60] She did not mention legal compliance. Rather than prioritize complying with the law, DoorDash created a "contracts playbook" with talking points and even "fallback positions" about the enforceability of their agreements.[61] That same approach is deployed here.

165.   DoorDash achieves speed and efficiency in its consumer registration process by skipping necessary steps to ensure users receive a definitive offer, a clear mode of acceptance, supported by sufficient consideration, and a mutual meeting of the minds. DoorDash skipped these steps to divert consumers' attention from the oppressive Terms, which could hinder the registration process if a consumer saw, read, and/or understood the complex legal language. Instead, DoorDash engineered a registration process that allows consumers to access and use its platform quickly in the name of speed and efficiency and at the sake of mutual assent.

166.   While DoorDash's registration process has evolved over the years with different notices, located in different places, with different distractions (like advertisements, graphics, and pending orders in carts), the process is and always has been deficient. The registration process does not create an environment in which consumers, like Plaintiff, see a conspicuous notice, and receive an unambiguous and definitive offer to contract that allows them to assent to the terms and waive fundamental rights, like a right to a jury, knowingly and intelligently.

167.   In its Terms, DoorDash says that any consumer who uses its technology "represent[s] and warrant[s]" that the user is "of legal age in the jurisdiction in which you

---

60 Lawtrades, *#6 - DoorDash Head of Commercial Kathy Zhu on Staying Nimble Despite Bandwidth Constraints*, YOUTUBE (11:51) (Dec. 17, 2020), https://www.youtube.com/ watch?v=ZWXbc6HCBwg.

61 *Id.*

reside to form a binding contract with DoorDash."[62] DoorDash's unconscionable terms purport to hold parents responsible for minors who use parents' account.[63] DoorDash does nothing to prevent minors from accessing its technology. DoorDash has the technology to verify consumers' ages—it verifies age for alcohol purchases. But DoorDash does not use that technology when consumers sign up to use its platform, despite knowing that a significant percentage of its 32 million users are minor children. Millions of minors have registered and used DoorDash. *See* illustration below of DoorDash's alcohol policy.

**Alcohol Orders**

### How is my age verified for alcohol orders?

There is a two-step process for age verification.

1. To check out: DoorDash offers a one-time process to verify your age when ordering alcohol. After you upload a photo of your ID, you'll be able to check out and complete your order.

2. To receive your order: Dashers will scan the front of of your ID

168.     In the Apple Store, DoorDash allowed its app to be rated for ages twelve and up. *See* illustration below.

---

62 *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH

¶ 2 (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

63 *Id.* ¶ 7.

1



2

3

4

5

6

7    169.    In the Google store, there is no age limit for the app. DoorDash allowed its app to

8    be rated E for everyone. *See* illustration below.

9

10

11

12   

13

14

15

16

17

18

19   170.    DoorDash does not require any age verification to register to use its platform,

20   despite having and using age verification technology for some orders on the platform.

21   Nor does DoorDash offer any parental controls on its platform. Nor does DoorDash

22   require a credit card for transactions, which would limit minors from ordering.

23   171.    Instead, DoorDash allows debit cards, preloaded debit cards (like Greenlight cards),

24   and even gift cards, all of which are payment methods minors use frequently.

25   172.    None of these facts surprise DoorDash. Indeed, during a podcast, Jonathan Levin,

26   Dean of the Stanford Graduate School of Business, told Tony Xu, a DoorDash co-founder

27   and its Chief Executive Officer, that Levin's 13-year-old son wanted to trade his  Nike

28

CLASS ACTION COMPLAINT                    55

and Amazon birthday gift cards for DoorDash gift cards.[64] Further, DoorDash knows that if a parent has ever lent their credit card to their child for a single online purchase, the credit card information is saved to the minor's mobile/online pay account, making it accessible for a minor who establishes their own DoorDash account with basic information and a cellular telephone and/or an email address.

173.     DoorDash also advertises to minors, including a Sesame Street-themed television ad campaign that aired during the 2021 Super Bowl. *See* illustration below.[65]



174.     DoorDash reportedly paid $5.5 million for its Sesame Street commercial, while committing to contribute no more than $1 million to Sesame Workshop. It cannot be argued seriously, therefore, that a Sesame Street-themed advertising campaign served a charitable purpose. The campaign was designed to attract children.

175.     In its Privacy Policy, moreover, DoorDash tacitly admits children under 18 use its delivery app. DoorDash says, "[o]ur Services are not intended for children under 16 years of age, and we do not knowingly collect personal information from children under the

---

64 Stanford Graduate School of Business, *Tony Xu, MBA '13, Cofounder and CEO, DoorDash*, YOUTUBE (starting at 30 second mark) (Feb. 12, 2021), https://www.youtube.com/watch?v= 5TidMV_ux_4.

65 Funny Commercials, *DoorDash Super Bowl Commercial 2021 Daveed Diggs Sesame Street*, YOUTUBE (Feb. 7, 2021), https://youtu.be/RWViEadCvuM.

age of 16."[66] At a minimum, the statement implies that DoorDash's services are intended for 16 and 17 year olds, none of whom have reached the age of majority or possess the capacity to contract.

176.     DoorDash cannot credibly contend that it does not know minor children use its service. Kids have cellular phones, which permit use of DoorDash. According to a Stanford Medicine study, "nearly all children had phones by age 15 years."[67] And it is well known that DoorDash deliveries (and those of other web-based services) are disrupting schools across the country—particularly high schools—raising security concerns and creating administrative nightmares. Dashers even talk about these problem deliveries in chat rooms.[68] One article compared DoorDash's penetration into schools to the cult-classic movie, *Fast Times at Ridgemont High*.[69] But this is no laughing matter. Many school districts have had to address DoorDash deliveries with some banning the delivers and a few allowing them, including school districts in New

---

66 *Privacy Policy – United States, DoorDash – General Privacy Policy*, DOORDASH ¶ 7(a) (Jan. 3, 2023), https://help.doordash.com/legal/document?type=cx-privacy-policy&region=US&locale=en-US.

67 Erin Digitale, *Age that kids acquire mobile phones not linked to well-being, says Stanford Medicine Study*, STANFORD MEDICINE NEWS CENTER (Nov. 21, 2022), https://med.stanford.edu/news/all-news/2022/11/children-mobile-phone-age.html.

68 *Why are (some) schools telling students that they cannot order food deliveries through DoorDash, GrubHub or UberEats, to be delivered to their schools?*, QUORA (June 6, 2019), https://www.quora.com/Why-are-some-schools-telling-students-that-they-cannot-order-food-deliveries-through-DoorDash-GrubHub-or-UberEats-to-be-delivered-to-their-schools.

69 Mustafa Gatollari, *High School Students DoorDash Lunch to School, Get Sent to Admin's Office in Viral TikTok*, DISTRACTIFY (Jan. 30, 2023, 12:06 PM EST), https://www.distractify.com/p/students-doordash-food-to-school.

Jersey, Massachusetts, Kansas, California, and Maryland.[70] Despite having technology to handle almost two billion orders every year (including orders for alcohol), DoorDash does absolutely nothing to verify the age of its users when they register. It cannot seriously be disputed that DoorDash intends for minors to use its platform.

177.     Plaintiff, and similarly situated consumers, are victims of DoorDash's deceptive, misleading, and fraudulent pricing scheme. DoorDash's fraud is far reaching, implicating almost every fee, price, or cost that DoorDash advertises and collects from consumers, like Plaintiff.

178.     DoorDash asserts that it "is not in the delivery business, does not provide delivery services, and is not a common carrier."[71]

---

70 Beccah Hendrickson, *South Jersey students ordering food to high school causing security issues, district says*, 6ABC (Feb. 1, 2022), https://6abc.com/west-depford-school- district-food-delivery-safety-doordash-uber-eats/11530002/; Brittany Polito, *Pittsfield School Policy Panel Considers Student DoorDash Ban*, IBERKSHIRES.COM (Mar. 3, 2023, 12:29 PM), https://www.iberkshires.com/story/71088/Pittsfield-School-Policy-Panel-Considers- Student-DoorDash-Ban.html; Katie Kausch, *Students can get DoorDash deliveries. Just follow the security rules, N.J. school says.*, NJ.COM (Feb. 16, 2023, 1:11 AM), https://www.nj.com/gloucester-county/2022/02/students-can-get-doordash-deliveries-just- follow-the-security-rules-nj-school-says.html; Audrey Menzies, *Principal, students contemplate Doordash deliveries to the school*, KC PIPER NEWS (Sept. 9, 2019), https://www.kcpipernews.com/18459/feature/principal-and-students-contemplate-doordash- deliveries-to-the-school/; Jonathan Sarabia, *Parents debate over the safety of delivering food to students in school*, KION NEWS CHANNEL 5/46 (Nov. 30, 2021, 11:52 AM), https://kion546.com/news/monterey-county/2021/11/30/parents-debate-over-the-safety-of- delivering-food-to-students-in-school/; Elaine S. Povich, *Students, bored by cafeteria fare, love food delivery services; schools don't.*, WASH. POST (June 9, 2019, 8:30 AM), https://www.washingtonpost.com/health/students-bored-by-cafeteria-fare-love-food-delivery- services-schools-dont/2019/06/07/2568d12c-8617-11e9-98c1-e945ae5db8fb_story.html.

71 *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH

179.     While disavowing it performs or provides deliveries, DoorDash nonetheless charges a "Delivery Fee" on most orders. DoorDash's explanations of the delivery fees are inconsistent and depend on where they are placed. The information icon accompanying the Delivery Fee merely states, "Delivery fee varies for each restaurant based on your location and other factors." In its webpage under customer support, DoorDash says the Delivery Fee "is charged on delivery orders and helps DoorDash cover costs associated with getting your order directly to you and can vary depending on the merchant location, and other factors, such as demand. Delivery fees currently can vary starting at $0."[72] None of these statements tell the consumer that DoorDash keeps the Delivery Fee in total, and that the fee is simply a revenue source unrelated to delivery of the consumer's specific order. *See* illustrations below:



¶ 6(a) (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

72 DoorDash Customer Support, *What fees do I pay?*, DOORDASH, https://help.doordash.com/consumers/s/article/What-fees-do-I-pay?language=en_US

1
2
3     180.    As the illustration in paragraph above demonstrates, DoorDash's explanations of
4          the Delivery Fee emphasize the location of consumers and restaurants and claim the fee
5          "helps cover the cost associated with getting your order directly to you." Emphasizing
6          the distance of the trip and "getting the order" to the consumer creates the logical
7          impression that the Delivery Fee is related to "deliveries." Thus, DoorDash creates the
8          impression that hardworking Dashers who perform "deliveries" will receive the
9          "Delivery" Fee. But that logical impression is not true. DoorDash keeps all delivery fees,
10         and the fees are related to the cost of DoorDash providing its technology.

11    181.    "Express" delivery on DoorDash purportedly represents a speedy-delivery option
12         that costs consumers, like Plaintiff, $2.99 for orders to be delivered directly to them.
13         Unlike with its other fees, DoorDash provides no written description of what "Express"
14         delivery or "direct to you" means. This lack of explanation is intentional insomuch as
15         DoorDash knows it cannot make an affirmative representation on delivery times given
16         the vagaries of the delivery process. So, DoorDash does the next best thing, it creates the
17         misimpression that ordering "Express" means consumers will receive their orders faster.
18         To that end, DoorDash advertises "Express" delivery as having shorter delivery time
19         windows—always setting that time frame as five to ten minutes shorter than a standard
20         time window—and it includes the phrase "direct to you" under the charge. Then
21         DoorDash reclassifies the "Express" delivery as a "priority fee" when itemizing its
22         charges during checkout. Upon information and belief, DoorDash switches its
23         nomenclature for the fee at this juncture so that it can preserve certain arguments, like
24         the "express" fee is not about speed but rather a consumer's position in DoorDash's
25         engineered delivery system. Unsuspecting consumers are duped by this practice. One
26         Dasher in a chatroom reacted to the express fee saying, "Holy crap DD is shady AF." *See*
27         illustration below representing a compilation of screenshots from DoorDash's App, its
28         contractor agreement, and chatroom discussions addressing the "Express Delivery Fee.":



182.    As the illustration in the above paragraph reflects, there is only one reasonable interpretation of the Express Delivery Fee: if a consumer pays the fee, DoorDash will ensure that consumer will get their food quicker. Despite that being the only justifiable interpretation, it is false because DoorDash has no ability to provide express or faster service it sells.

183.    According to DoorDash, the company neither provides deliveries nor controls the manner or means in which deliveries occur (as DoorDash has represented in its independent contractor agreement with its drivers and in defense of litigation against them).

184.    Upon information and belief, DoorDash does not even tell its drivers when a consumer places an Express Delivery order or otherwise informs them that the order is a priority. Nothing prevents a Dasher from stacking an Express order with other orders for DoorDash or any other delivery company—taking more time rather than less, and certainly not delivering "direct to you." And the five-to-ten-minutes-shorter time windows DoorDash advertises for its express service are demonstrably false. Once an order is placed, within seconds or sooner, DoorDash reveals the previously concealed true delivery time window from its dispatch system. The real delivery window is typically longer than the advertised "Express" window and even the advertised standard delivery window. DoorDash has information that could inform consumers that the order will not be any more "express" than a standard order, but DoorDash conceals that information until after the order has been placed. Upon information and belief, as part of its fraud, DoorDash sets its advertised delivery windows for all orders to appear shorter than true

market conditions to avoid losing sales. Consumers literally pay for nothing when selecting the option for Express Delivery. This is because DoorDash cannot provide what consumers purchased, it is not relevant whether DoorDash in fact provided an express delivery that was consistent with or better than the advertised express delivery window (on any individual, isolated basis).

185.   DoorDash charges consumers, like Plaintiff, a fee to make "expanded range deliveries." DoorDash defines "expanded range delivery" to consumers as occurring when the "restaurant is outside of your normal delivery area." *See* illustration below:



186.   Contrary to DoorDash's representations in the above disclosure, consumers do not have a "normal delivery" area. Unlike its representation to consumers, DoorDash tells merchants and contractors something far different about delivery areas. In various hard-to-find places on its website, DoorDash says, "[e]ach store on DoorDash has a circular delivery area extending out from their store. Any consumer within that delivery area will be able to see and order from that store. DoorDash defines the delivery area for each individual store based on their partnership structure on DoorDash."[73] *See* illustration.

_____

73 *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023); DoorDash Dasher Support, *What is a "Delivery Radius" or a "Delivery Area" on DoorDash?*, DOORDASH,

187.     As the above illustration reflects, DoorDash defined its delivery areas based on its merchant's partnership, not any consumer's location as DoorDash represented to consumers. In other words, a "delivery area" or "delivery radius" is a function of how much money a restaurant pays DoorDash. But DoorDash qualifies this position some in other places on its website, stating "[t]here is not a standard delivery radius for merchants on DoorDash. The delivery radius is ***set by an algorithm*** based on how many Dashers are in your area and consumer demand. Plus and Premium members do get access to a larger delivery area than Basic, potentially reaching more customers."[74] In other words, DoorDash manipulates delivery areas based on its Dashers locations, consumer demand and merchants' partnership with DoorDash. Again, this definition of delivery area contradicts DoorDash's representation to consumers when explaining the Extended Range Delivery fee as based on consumer location. But this definition makes clear delivery areas arise from merchant payments to DoorDash.

---

https://help.doordash.com/dashers/s/article/What-is-a-Delivery-Radius-or-a-Delivery-Area-on-DoorDash?language=en_US (last visited Apr. 14, 2023).

[74] *Id.*

188.     For example, one chain restaurant, like a Chick-fil-a, might be located closer to a consumer's home, but DoorDash could assign deliveries to that home to a different Chick-fil-a further away if that restaurant pays DoorDash more money under its partnership structure for a larger delivery area. DoorDash then may charge consumers more for delivery fees and/or for expanded range deliveries, despite closer delivery options being available. This scenario occurs because the consumer has no normal delivery area. Rather, DoorDash employs the Expanded Range Fee at its whim, irrespective of the "consumer's location" or any "normal delivery area" for the consumer. *See* illustration below of how the Expanded Range Delivery Fee works:



189.     If the Expanded Range Fee is premised on a set geographic delivery area for a consumer as DoorDash represents, that fee would be applied equally to consumers similarly located. In a test on the DoorDash Platform, however, DoorDash applied the Expanded Range Fee to a DashPass account, but not to a standard account when each account placed the same order at the same time to the same restaurant for delivery to the same home. The illustrations on the next page demonstrate that the Expanded Range Fee is a money grab that DoorDash employs *sua sponte*.




190.     Upon information and belief, since being sued for such fees above, DoorDash

changed the way it refers to delivery areas or delivery radius.

191.     In resource materials for Dashers describing the delivery area, DoorDash now says,

"[e]ach merchant on DoorDash has a dynamic delivery area where customers within that

range will be able to discover and order from that store. There is no standard numeric

delivery radius for merchants on DoorDash. The delivery radius a merchant has access

to is dynamic and influenced by a variety of factors, including Partnership Plans."[75] In

other words, the delivery area is now a nebulous concept that will fluidly or dynamically

change based on a variety of undisclosed factors at DoorDash's whim. However, this

change does not cure DoorDash's false representation that the Expanded Range Delivery

---

75 DoorDash Dasher Support, *What is a "Delivery Radius" or a "Delivery Area" on DoorDash?*,

DOORDASH, https://help.doordash.com/dashers/s/article/What-is-a- Delivery-Radius-or-a-Delivery-

Area-on-DoorDash?language=en_US (last visited May 3, 2023); *Frequently Asked Questions*,

DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*,

https://get.doordash.com/en-us/faq (last visited May 3, 2023).

Fee is based on a consumer's "normal" delivery area given no "normal" area exists. *See* illustration below:



192.    DoorDash advertises menu item promotions that include hidden fees that it charges consumers without disclosing them ("Marketing Fees"). In describing this scheme, DoorDash explains to merchant restaurants (but not to consumers like Plaintiff) that: Offers Hub which helps surface the most relevant offers that they are most likely to choose. You can also choose to target this promotion to certain customers only based on certain factors. . . Customers who qualify for the promotions will see them in the Offers Hub either based on the spend threshold or the items they have selected in their cart. **You'll pay for the item** or discount offered to the customer **as well as a $0.99 marketing fee** to power our Offers Hub and marketing efforts to deliver the best customers that will order from you and return as well.[76]

---

76 DoorDash Merchant Support, *Menu Item Promotions - Merchant Promotion Overview*, DOORDASH, https://help.doordash.com/merchants/s/article/Menu-Item-Promotions-Merchant-Promotion-Overview?language=en_US (last visited May 3, 2023) (emphasis added).

CLASS ACTION COMPLAINT                      66

193.     Unfortunately for consumers, the "You'll pay" language truly references the consumer, not the restaurant, since this undisclosed fee is included in the menu price that is only charged to and paid by consumers. Indeed, DoorDash studies consumer habits relentlessly based on the billions of data pieces it receives from orders, learns which items are "most relevant" and "most likely [for consumers] to choose," and then adds a hidden Marketing Fee. Consumers then pay for DoorDash's undisclosed $0.99 Marketing Fee on promotional items without ever knowing that hidden charge was included as part of a "promotion." DoorDash applies this fee in the same manner and in the same amount to different promotions. *See* illustration below.[77]

**Menu Item Promotion Structures**

| Item Promos (Free over $X) | Marketing fee + item offered |
|---|---|
| Buy One Get One | Marketing fee + item offered |
| Buy Item Get x% or $Cff | Marketing fee + discount |

---

[77] *Id.*

194.     Embedded in every order that consumers place on DoorDash are undisclosed "commissions," which are nothing more than another hidden delivery fee that consumers pay.

195.     DoorDash explains to restaurants (but not consumers) that, "[w]hen [a restaurant] list[s] [its] business on DoorDash, [it] pay[s] a percentage of the order subtotal — known as a "commission rate" — for each order processed through our platform."[78] These commissions range from 20% to 29% on delivery orders and from 8% to 10% on pickup orders (collectively "Commission Fee") before being sued for such fees. *See* illustration below.



---

78 *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What do commissions and fees cover?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023); Sara DeForest, *Food Delivery and Pickup Commissions and Fees, Explained*, DOORDASH FOR MERCHANTS (May 2, 2023), https://get.doordash.com/en-us/blog/food-delivery-pricing.

196.     The commission rate allegedly covers a range of contrived delivery and other costs, including undisclosed credit card processing surcharges at a rate of 2.9% plus $0.30 per consumer transaction.[79] *See* illustration below:



197.     Regardless of how DoorDash spins it, consumers pay the "Hidden Commission Fees." DoorDash includes the commission fee in the menu item price, and charges consumers for that fee on each order. When consumers pay that fee, DoorDash collects and retains their money without ever informing consumers the fee was included, which includes credit card surcharges. The disclosure of surcharge is required under 12 C.F.R. § 1026.9(d)(1). The Hidden Commission Fee is the epitome of deception and fraud, injuring both consumers and restaurants. Because restaurants view the Hidden Commission Fee as potential lost consumer revenues, restaurants increase their menu prices, which cause consumers to pay more. But DoorDash obscures the fact that menu prices on its platform for deliveries are often significantly higher than prices available when ordering directly from the restaurant. Consumers, therefore, are truly the only

---

79 Upon information and belief, DoorDash has since changed its commission rate structure in terms of the percentage charged at different thresholds.

party harmed by Hidden Commission Fees, while DoorDash benefits as these fees increase prices. DoorDash lures consumers, like Plaintiff, into its predatory pricing practices with illusory advertisements promoting discounts on food costs and fees. For example, the DoorDash Platform deceptively offers consumers deals such as 20% off up to $5, without disclosing the consumer must meet a minimum order threshold to receive the advertised discount. When a consumer does not meet the minimum dollar amount, DoorDash does not apply the discount and never informs the consumer that the discount will not be applied. The consumer can only learn about the qualifiers on DoorDash's advertisements by searching the platform further.

198.     The illustration below demonstrates the 20% off up to $5 advertisement scheme. After clicking on the advertised sale for 20% off up to $5, the consumer is taken to the restaurant page, which has a sales banner that highlights a different advertisement. This advertisement encourages the consumer to spend even more money without ever revealing the terms of the initial discount offer. The consumer must scroll across that banner to find the initial advertised offer for 20% off up to $5. And only after locating that advertisement does the consumer learn DoorDash has a $15 minimum-spend requirement for its 20% off up to $5 advertisement. *See* illustration below.



199.     DoorDash also lures consumers, like Plaintiff, with advertised discounts fees. These discounts, however, are deceptive and illusory. DoorDash routinely advertises zero-dollar delivery on the marketplace page (as reflected in the illustration on the left below without identifying that a minimum spend is associated with the offer and that expanded range fees may apply (as reflected in the illustration below):



200.     Under its scheme, DoorDash's advertisements entice consumers to make their purchases based on a misleading price—the "bait" in the bait-and-switch. The advertisement is deceptive because DoorDash tricks consumers into placing orders without realizing they will not qualify for the advertised discount. By using the advertisement as the bait for the transaction, DoorDash deprives consumers of important information about the true cost of their service. This interferes with a consumer's ability to comparison-shop among restaurants, compare the total cost of using one delivery service versus another, and weigh the costs and benefits of ordering from DoorDash versus ordering directly from the restaurant. The DashPass is not spared from DoorDash's fraud and deception. DashPass is a subscription service that DoorDash sells on either a monthly or annual basis under which consumers are supposed to realize $0 delivery fees and other savings. For example, DoorDash advertises on Google Ads that

consumers will receive "unlimited $0 deliveries" as a DashPass member. *See* illustrations below.



201.    But like its other misleading advertisements, DoorDash's advertised DashPass savings is equally deceiving. Consumers, like Plaintiff Masters, only learn after searching the DoorDash website further that its advertised "Unlimited $0 Delivery Fee" for a DashPass membership has some sort of minimum spend requirement, as reflected in the following illustration below:



1

2    202.    Indeed, there is always a minimum-spend requirement associated with DashPass

3    offers, as DoorDash explains in an obscure customer support section of its website.

4    DashPass is "a subscription service that offers unlimited deliveries from thousands of

5    eligible restaurants  with $0 delivery fee on orders over $12. If you are a DashPass

6    subscriber but your order does not meet the minimum basket subtotal, your DashPass

7    benefits will not apply."[80] Thus, any advertisement that does not mention the minimum

8    spend is per se misleading.

9    203.    While DoorDash publicly advertises DashPass savings on thousands of

10    restaurants, it does not advertise that many restaurants do not participate in the program.

11    Again, hidden in the customer support section of its website, DoorDash reveals "to make

12    sure your order is eligible, look for the green DashPass icon underneath the merchant's

13    name".[81]

14    204.    In most cases, DashPass holders presume discounts apply on all orders given how

15    DoorDash advertises the savings misleadingly. Thus, DoorDash twice deceives DashPass

16    holders through DoorDash's advertisements: (1) when they incur delivery fees for orders

17    under the minimum spend and (2) when they incur fees on orders placed with non-

18    participating merchants.

19    205.    Equally misleading are DoorDash's advertisements that "DashPass subscribers

20    save an average of $4-5 per eligible order."[82] DoorDash sells DashPass for "$9.99/month

21    with the monthly plan or $96/year ($8/month) with the Annual Plan." But these purported

22    savings are falsely represented and, upon information and belief, are in fact engineered.

23

24

---

25    80 DoorDash Customer Support, *DashPass*, DOORDASH,

26    https://help.doordash.com/ consumers/s/article/What-is-DashPass?language=en_US (last

27    visited May 3, 2023).

28    [81] *Id.*

    [82] *Id.*

206.    DoorDash's DashPass embodies many elements of DoorDash's predatory pricing practices. Under this test, DoorDash applied the Expanded Range Fee to a DashPass account but not to a standard account despite each account placing the same order at the same time to the same restaurant for delivery to the same home.

207.    Upon information and belief, DoorDash on occasion applies the Expanded Range Fee to DashPass accounts to recoup or offset some of the purported discounts provided under that program. Upon further information and belief, DoorDash "engineers" DashPass savings by charging other fees and changing minimum spend thresholds *sua sponte* to ensure that program remains profitable. DoorDash then drives consumers to spend more on DashPass by advertising false savings.

208.    For example, under the aforementioned test, DoorDash falsely tells the DashPass account holder that the delivery fee of $2.99 is zero when in fact the Delivery Fee charged to a consumer is only $0.49, as reflected on the standard account. DoorDash discounts the service fee on the DashPass which lowers the taxes, but DoorDash then assesses an Expanded Range Fee on the DashPass account to recoup part of that discount. DoorDash then falsely represents that the DashPass holder saved $4.22 on this order when that holder really saved only $0.73 on the exact same order from a standard account. The unsuspecting consumer believes they saved almost half the value ($4.22) of a monthly DashPass ($9.99) in one order. But, of course, that representation is false. DoorDash's promotion of the DashPass is a significant part of its fraudulent sales gimmick scheme to reduce illicit delivery fees *See* illustrations below:




209.     For any of the above reasons and for all of them, DoorDash misrepresents DashPass savings. Upon information and belief, DoorDash "engineers" fee reductions under DashPass as a profit center achieved at certain consumer minimum spend thresholds, allowing for true savings only at higher consumer spend thresholds. The DashPass account holder never realizes the benefit of the bargain with DoorDash's manipulation. Moreover, the DashPass account holder like Plaintiff Masters never assented to the Terms and Conditions when registering to become a DashPass member. DoorDash makes disclosures on its Platform, in its Terms and Conditions, and in various locations throughout its website, particularly in the hard-to-find support search function. As a threshold matter, the DoorDash Platform's disclosures are neither clear nor conspicuous. In making disclosures on its platform, DoorDash uses small icons with a lower-case "i" enclosed in a circle to provide curt explanations of certain fees only if a consumer clicks on that icon to access it. The disclosures "explain" fees and pricing in a manner that omits or misleads material facts about DoorDash's billing practices in furtherance of its deception. These explanations conceal and/or misrepresent not only the true nature of the fees charged, but also the identity of who or what entity receives them. DoorDash also provides these disclosures in various other places with contradictory explanations.

210.     For example, earlier paragraphs discuss DoorDash's misleading description of the Expanded Range Fee, and another paragraph discusses DoorDash's misleading description of the Delivery Fee.

211.     In those informational icons, DoorDash misleads consumers, like Plaintiff, about delivery areas and costs related to deliveries. But DoorDash places slightly different information about its prices and fees where consumers are unlikely to see or seek them, i.e., on its merchant restaurant's menu page. On that merchant's page, hidden near the top, underneath the restaurant's logo, obscured by the bolded restaurant name, and above larger bolded icons for pickup and delivery options, DoorDash places an informational icon that address DoorDash's prices and fees in small gray font. If a consumer clicked on that icon, DoorDash provides various explanations of its charges, including all fees "go

to DoorDash and help cover the costs of operating the DoorDash Platform." By strategically locating this pricing and fee icon in the same place where hungry consumers are ordering food and where menu items prominently display pricing information under them already, DoorDash limits the likelihood consumers will ever see this information.

212.     Instead, consumers are more likely to see the icons next to the itemized fees during the checkout process, and the icons for Delivery Fees and Expanded Range Delivery Fees focus on those fees being related to deliveries. There is no mention about DoorDash retaining the fees or the fees being part of the cost to operate the platform. Thus, DoorDash's disclosures are deceptive in terms of both location and substance. *See* illustrations below.



213.     With respect to substance, DoorDash's delivery disclosures create two misleading impressions. First, the delivery-related fees relate to delivery work performed by Dashers. Second, Dashers receive the delivery fees for performing deliveries. Neither impression is true. Instead, DoorDash collects and retains all delivery related fees, which are nothing more than a partitioned service fee.

214.     Taking delivery related fees for itself, DoorDash only gives Dashers a "delivery offer." A delivery offer is a predetermined compensation package for each order that is separate and apart from, and not identified on, any consumer order. Upon information

and belief, the offer is directed to a specific Dasher who can accept or reject the offer, although rejection comes with consequences as it may interfere with future delivery offers. Dasher compensation in the delivery offers principally consists of a base pay, which DoorDash creates and advertises as ranging from $2 to $10 per trip,[83] but appears to average around $3 per trip. DoorDash may also give a Dasher promotional pay for an order and the driver might receive a tip.[84] Neither the promotional pay nor the tip is a guaranteed part of a delivery offer. While DoorDash will reveal to Dashers the promotional pay included before they accept an offer, upon information and belief, DoorDash may conceal or alter or change the consumer tip on an order. DoorDash likely takes these actions as manipulative attempts to urge Dashers to accept the payment offer. One of the most critical issues facing Dashers is the lack of a consumer tip. The tip represents a significant portion of Dasher's compensation, making the difference between a profitable or losing job. But Dashers frequently receive no or little tip because DoorDash misleads naïve consumers into believing Dashers (not DoorDash) receive the range of delivery related fees for deliveries that the Dashers (not DoorDash) perform. These misleading impressions—caused in part by misleading "disclosures"—create a tension between consumers and Dashers over the costs that consumer pay for deliveries. DoorDash is solely responsible for creating this tension. But Dashers have little recourse for DoorDash's actions given Dashers waive crucial rights under their DoorDash independent contractor agreement. And DoorDash mistakenly believes that its Terms and Conditions similarly constrain consumers.

215.    One source defines "price discrimination" as "a selling strategy that charges customers different prices for the same product or service based on what the seller thinks

---

[83] DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited May 3, 2023).

[84] *Id.*

they can get the customer to agree to. In pure price discrimination, the seller charges each customer the maximum price they will pay. In more common forms of price discrimination, the seller places customers in groups based on certain attributes and charges each group a different price."[85] Upon information and belief, DoorDash charges different customers different fees for the same orders based on discriminatory reasons.

216.    As mentioned above, DoorDash states in its informational icon that its "Delivery fee varies for each restaurant based on your location and ***other factors***."[86] DoorDash expands on this description slightly in its webpage under customer support, stating the Delivery Fee "is charged on delivery orders and helps DoorDash cover costs associated with getting your order directly to you and can vary depending on the merchant location, and ***other factors***, such as demand."[87] In searching for further explanation of the mysterious, non-descript "other factors," DoorDash does not disclose that its charges more delivery fees for any reason other than demand—and demand should not be a delivery issue for a company that does not perform deliveries.

### THE TRUTH ABOUT DOORDASH'S FRAUDULENT PRICING SCHEME

217.    DoorDash is committing a massive fraud. DoorDash's predatory pricing practices charges fees arbitrarily and capriciously in violation of numerous federal, state, and common law, including Section 5 of the Federal Trade Commission Act, 15 U.S. Code § 45. Despite this fact, DoorDash says its "mission [is] to grow and empower local economies," but DoorDash's predatory tactics achieve the opposite results. Merchants earn less revenue and endure more competition in sales; consumers pay more for food costs; and drivers are left searching for profitable gigs that are few and far between. To that end some drivers even contend DoorDash hires individuals to promote fictitious gigs with unrealistic payments on TikTok and other social media platforms to

---

85 Alexandra Twin, *What Is Price Discrimination, and How Does It Work?*,
INVESTOPEDIA (June 13, 2022), https://www.investopedia.com/terms/p/price_discrimination.asp.

86 *Supra* ¶ 106 (emphasis added).

87 *Id.*

CLASS ACTION COMPLAINT          78

influence Dashers to drive for the company.[88] And for those who do drive, DoorDash's misrepresentations create conflicts between consumers and drivers over tips and delivery fees. And DoorDash's misrepresentations cause animosity between consumers and local establishments over increased prices. Thus, DoorDash's claim that it grows and empowers local economies is as fabricated and fraudulent as its pricing practices.

218.    DoorDash presents its predatory pricing scheme to consumers, like Plaintiff, in a uniform manner. Regardless of the device used (Android or Apple) or the platform accessed (mobile app or website), each consumer interacts with DoorDash in the same manner and is subjected to the same fraudulent scheme that DoorDash advances with the same deceitful representations. DoorDash's fraud occurs every day, in every transaction with every consumer in many ways. While the range of damages for consumers, like Plaintiff, may vary, DoorDash's records will provide that information uniformly. Consumers register with DoorDash in the same basic manner and are exposed to the same deficient language during the registration process. In this respect, DoorDash treats all consumers the same: DoorDash distracts each consumer from seeing and reading the Terms and Conditions by employing a cluttered registration process focused on speed and efficiency rather than disclosure and compliance. As a result, DoorDash fails to provide consumers with a definitive offer, with sufficient consideration, or with proper inquiry notice or otherwise to allow them to manifest their assent to a contract when registering to use the DoorDash Platform.

219.    Adding to its deception, DoorDash uses its Terms and Conditions to force unaware consumers into strategic acknowledgements, while concealing the details of its dubious conduct in incomprehensible legalese. Without providing true inquiry notice, avoiding clickwrap agreements it uses with merchants and drivers and using

---

88 Driven Wyld, *Doordash Driver EXPOSES Company for False Advertising! The Harsh Truth! UberEats Grubhub Instacart*, YOUTUBE (Apr. 13, 2023), https://www.youtube.com/ watch?v=cnam6bA3nc4.

manipulative registration tactics, DoorDash knows consumers are unlikely to see any misleading partial "disclosures." As a result, DoorDash includes misleading statements in its Terms and Conditions to preserve arguments about the nature of its deceptive and fraudulent conduct. But even if the average consumer could find the misleading, partial "disclosures," that reasonable consumer could not understand them, or piece together DoorDash's entire scheme. These disclosures, like the rest of the terms, are legally complex and dense, spanning over 27 standard, single-spaced pages. DoorDash's purported "contractual" Terms and Conditions are truly nothing more than an instrumentality of, or a part of the means for, accomplishing the fraud perpetuated on consumers.

220. DoorDash hides Marketing and Commission Fees in menu items that consumers unwittingly pay and DoorDash collects. The Commission Fee includes surcharges not only on credit card transactions, but also on debit and pre-paid debit card transactions in violation of applicable laws. DoorDash falsely advertises items as discounted when they are secretly marked up with hidden fees. The impact of these hidden fees is significant. Restaurants increase their prices on consumers, who then must pay more for DoorDash's service fee because it is a percentage of food costs. Consumers bear the expense of this perverse economic model.

221. Relying on its Terms and Conditions in part to shield it from exposure, DoorDash engages in deceitful advertising. DoorDash uses strikethrough pricing (where an original price is struck and replaced with a lower price); partition pricing (separating a single price to make it look smaller); drip pricing (revealing more costs as the sale process proceeds); price discrimination (charging consumers different prices for the same service); and dark patterns (having consumers become invested in their purchase through manipulation) as part of a bait- and-switch advertising scheme to market food and delivery costs to consumers, including its sale of DashPass. Like a game of three-card monte, DoorDash moves the costs from one category of fees to another so consumers never truly know the standard pricing and never truly realize the benefit of the advertised deal.

222.     DoorDash makes various misrepresentations in connection with the services provided and fees and costs charged. DoorDash intentionally misrepresents the speed of deliveries, selling a faster delivery directly to you without any true ability to ensure what it is selling can be provided. DoorDash misrepresents that the merchant's location or distance increases DoorDash's costs, when Dashers incur the travel expenses and DoorDash has already charged merchants for delivery fees relating to the Dashers' services. In applying these fees, DoorDash creates confusion over who is providing the delivery service although it only provides technology over its platform. DoorDash similarly misrepresents Dashers receive fees associated with the delivery services that DoorDash collects and keeps in total—fees that have nothing to do with actual deliveries. Each of these misrepresentations is an integral part of an intentional scheme to manipulate and trick consumers, deceiving them into paying their hard-earned money.

223.     DoorDash engages in a modern-day bait-and-switch. With respect to the "bait," DoorDash advertises low, or no cost delivery fees or promotional or discounted menu items to consumers. But DoorDash does not intend to provide any true discount.

224.     Instead of a discount, consumers, like Plaintiff, endure the "switch" where DoorDash charges them a bevy of fees for marketing, food commissions, DashPass, and a range of contrived delivery services. DoorDash levies these fees to reach its desired per-job compensation level without ever truly providing the advertised bait. DoorDash then engages in a series of other manipulative practices to conceal and complete its deceptive and fraudulent actions.

225.     DoorDash hides certain concessions from consumers instead of providing prominent informational tabs with complete, consistent, and candid disclosures. Where strikethrough pricing is used on its platform, DoorDash does not include a disclosure stating, it "does not represent that the strikethrough price was the regular or former price of items for any particular period of time"[89] and that its menu pricing "may not

---

[89] *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(b) (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

be the lowest prices at which the menu or other items are sold and may change at any time without notice."[90]

226.    DoorDash, instead, uses "informational" tabs with contradictory and misleading explanations that dissuade the consumer from searching further. And then DoorDash advertises delivery windows that mislead hungry consumers, who have all the attendant physical and psychological symptoms (including impacted decision making) that accompany hunger, into believing that DoorDash will deliver in a time that DoorDash already knows it cannot meet. With these artifices deployed, DoorDash unilaterally applies the Delivery Fee and Expanded Range Fee to orders and allows consumers to purchase the Express option for yet another fee, leaving the impression drivers are making deliveries further and faster and incurring charges along the way.

227.    But, to reiterate, these fungible fees have nothing to do with delivery drivers. DoorDash invented them and retains them in total. Similarly, DoorDash retains a Marketing Fee that DoorDash hides in promotional items and a Commission Fee that DoorDash hides in all menu items without ever informing consumers that they are paying these fees. DoorDash even charges consumers for using their credit cards and debit cards without ever telling them.

228.    All DoorDash's fees—Delivery Fee, Extended Range Fee, Marketing Fee, Commission Fee, Regulatory Fee, DashPass Fee, and Express Fee—are untethered from real, distinct elements of DoorDash's service. Consumers do not receive any actual convenience or distinct benefit when paying for these fees separately because they represent a single amenity, namely the cost of technology service that DoorDash provides. DoorDash's choice to charge consumers numerous categories of separate fees for its service, rather than one, all-inclusive fee disclosed upfront, is an integral part of its deceptive sales strategy both nationwide and in South Carolina. And under this

90 *Id.* ¶ 12(a).

strategy, DoorDash misleadingly and fraudulently advertises to consumers, like Plaintiff, that DashPass offers certain benefits that it does not truly provide.

229.    Arbitrarily parceling out the full charge wards off sticker shock and misleads consumers regarding the true price of DoorDash's service. To that end, DoorDash engages in partition pricing (dividing the full price of services into parts) and drip pricing (promoting only a portion of a service cost upfront, revealing the rest only as consumers navigate and complete the buying process). And when DoorDash advertises its costs for fees, services, and even food, it uses deceptive strikethrough pricing. DoorDash then charges consumers different amounts for the same order involving the same services, delivered to the same address, which represents price discrimination. DoorDash's employment of all these dubious pricing methodologies supported by partial and misleading disclosures, operate to defraud consumers. The Federal Trade Commission has recognized many of these methodologies (in the manner DoorDash employs them), as misleading. And consumer watchdogs warn against some of these practices because separating prices "can lower customers' perceptions of total cost" and "makes continued search costlier and more complicated."[91] Upon information and belief, each of these dubious fees is part of a fraudulently engineered pricing scheme that fluidly achieves predetermined revenue goals for orders. DoorDash manipulates its fees, like its Delivery Fee, at its whim, advertising $0 for some deliveries to entice consumers to continue using the platform while it simultaneously raising fees in other areas. And DoorDash employs discounts on these fees to sell monthly "DashPass" accounts, beneficial to the company because consumers pay DoorDash a flat monthly rate even when they do not place a single order. Alternatively, DashPass consumers must buy more to realize true savings. Either way, DoorDash wins because it determines (or "engineers") the cost of each order and then engineers the best manner to get consumers to pay it. Unsuspecting consumers have no benchmark against which to measure whether they truly receive a discount

---

91 David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 59 (2020).

because DoorDash never tells the truth about what represents the base "fee" for any order. Imagine walking into a grocery store and seeing the price of eggs change each time a different person examines them. Or worse, imagine if a grocery store clerk simply made up a price or told you an additional fee applied after you loaded your cart with eggs, unloaded them onto the belt, and began paying for them. Or perhaps the worst, imagine if the grocery store clerk charged you more for those eggs because you had an iPhone or looked like you could pay more. These seemingly far-fetched scenarios occur in real-life when consumers use the DoorDash Platform.

230.    All delivery, marketing, and commission fees that DoorDash directly or indirectly charges consumers, like Plaintiff, are misleading, deceptive, and fraudulent. DoorDash creates its misleading and hidden fees because it knows consumers will use its platform less as fees that go directly to DoorDash increase.[92] As a result, DoorDash, encourages (even creates the ability for) restaurants to increase menu prices for delivery items because that means more money for DoorDash, without consumers ever realizing that DoorDash is responsible for the increased costs.[93] And then DoorDash slowly drips the additional fees and costs associated with using its platform until the end of the order, revealing more of the true cost at checkout when consumers feel invested. This approach increases the likelihood consumers will complete the transaction despite incurring additional fees. Experts in the design of e-commerce user interfaces describe this tactic as a "dark pattern [that] exploits the sunk cost fallacy cognitive bias: users are likely to feel so invested in the process that they justify the additional charges by completing the purchase to not waste their effort."[94] This approach represents the essence of psychological manipulation.

---

[92] *The impacts of price controls*, DOORDASH (Apr. 8, 2021), https://doordash.news/company/the-impacts-of-price-controls/amp/.

[93] Sara DeForest, *Food Delivery and Pickup Commissions and Fees, Explained*, DOORDASH FOR MERCHANTS (May 2, 2023), https://get.doordash.com/en-us/blog/food-delivery-pricing.

[94] Arunesh Mathur et al., *Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites*, Proc. ACM Hum.-Comput. Interact. 81, 13 (2019).

CLASS ACTION COMPLAINT                84

231.    In the end, consumers, like Plaintiff, are injured in the same way by incurring monetary damages, which can be calculated based on information from DoorDash's records. DoorDash's predatory practices in effect steal consumers' hard-earned money and their precious ability to make informed decisions when using technology to order in the on-demand delivery market. DoorDash's deceit generates billions in annual revenue using tactics that manipulate, trick, deceive, and/or induce consumers, like Plaintiff, into using DoorDash not only at a much higher and premium price, but also without receiving the true benefit of their bargain. In other words, consumers hold the risk and fund the cost of DoorDash's fraudulent game of "Catch Me If You Can." Plaintiff now sues to recover her damages from DoorDash's predatory pricing practices.

232.    This case raises four fundamental questions: (1) whether DoorDash's wrap agreement creates an enforceable contract between DoorDash and consumers; (2) if the wrap agreement can create a contract between DoorDash and consumers; (3) even if the wrap agreement can create a contract between DoorDash and consumers, whether the arbitration agreement is supported by adequate, separate consideration; and (4) even if the wrap agreement can create a contract between DoorDash and consumers, whether the DoorDash Platform allows consumers to knowingly and voluntarily waive their right to a jury trial. These fundamental questions are asserted on behalf of a potential class of millions of consumers nationwide, and tens, if not hundreds, of thousands in California and South Carolina alone. Each of these individuals fell victim to DoorDash's common, fraudulent, and deceptive scheme without ever assenting to a contract based on a clear offer, acceptance, and consideration—basic contractual elements (including sufficient notice)— that would make the Terms and Conditions binding.

233.    Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in any and all preceding paragraphs in support of their RICO count.

234.    In 1970, Congress passed RICO as part of a comprehensive legislative package aimed at combating the influence of organized crime on interstate

commerce,[95] from infiltrating legitimate businesses.[96] When it enacted RICO to address criminal activity, Congress included a civil remedy provision that allows private parties to sue for injuries to their "business or property" caused "by reason of" a defendant's violation of RICO.[97]

235.     DoorDash's massive fraud on consumers implicates two of the four types of activities that RICO outlaws. First, DoorDash's conduct implicates § 1962(a), which prohibits a person from investing in an enterprise any income that is derived from a pattern of racketeering activity.[98] Second, DoorDash's conduct implicates § 1962(c), which prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering.[99] Below, we address each of DoorDash's multiple violations of RICO.

236.     DoorDash is a culpable person as defined under RICO and recognized in law.[100] DoorDash intended to engage in fraudulent conduct with actual knowledge that its conduct violated applicable law as evidenced by its deceptive and misleading statements and attempts to conceal the true nature of its fraudulent scheme. Indeed, over the past several years, at a minimum, consumers, merchants, drivers, and even municipalities have sued DoorDash because of its illegal, fraudulent activities. As a culpable "person," DoorDash both invested income from racketeering activity into an enterprise and/or conducted the affairs of a distinct "enterprise" through a "pattern" of "racketeering" in a way that proximately caused Plaintiff's injuries.

---

95 S. Rep. No. 91-617, at 76 (1969) (stating that RICO's purpose was "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce").

96 Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and Strategy, § 1.01, at 1-4 (2000 ed.) (quoting S. Rep. 91-617, at 76 (1969)).

97 18 U.S.C. § 1964(c).

98 18 U.S.C. § 1962(a).

99 *Id.* § 1962(c).

100 *Id.* § 1961(3) (defining a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property").

237.     In implementing its predatory pricing practices against consumers, like Plaintiff, DoorDash engaged in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 (collectively "DoorDash's Predicate Acts"). DoorDash's mail and wire fraud represent the predicate acts underlying its racketeering activities.

238.     **Particularities of Mail Fraud.** DoorDash uses a persistent course of conduct over numerous years in which it sends advertisements through the mail to consumers, like Plaintiff Masters, at her place of residence. In those advertisements, DoorDash not only promotes its predatory pricing practices, but entices consumers, like Plaintiff Maters, to use the DoorDash platform with misleading discount offers. Plaintiff Masters has received these mail solicitations, and those solicitations helped induce her to place orders with DoorDash. The mail solicitations helped further DoorDash's fraudulent pricing scheme.

239.     **Particularities of Wire Fraud.** In completing its fraud on consumers, like Plaintiff, DoorDash uses text-messages and e-mail communications between Plaintiff, DoorDash, merchants, and Dashers, throughout the pendency of the order. These communications occurred at the time and date each Plaintiff placed an order and went to each of them at the specified delivery location. The content of these communications confirmed orders, updated consumers on the status of orders placed with merchant restaurants, informed consumers on the delivery status, explained delays or other problems, and confirmed when delivery occurred. On occasions, consumers like Plaintiff, also received communications from Dashers about the status of the consumers' orders. Plaintiff ordered from DoorDash on numerous occasions over the years. DoorDash possesses records of each order, which contain the specific time, place, and content of the wire communication, which Plaintiff will obtain during discovery.

240.     DoorDash engaged in numerous racketeering activities over the last four years.[101] DoorDash's Predicate Acts are related and continuous and, thus, form a "pattern of racketeering." DoorDash's Predicate Acts harm consumers like Plaintiff.

241.     **Related Acts.** DoorDash's Predicate Acts are related or interrelated because they have the same or similar: (a) purposes, (b) results, (c) participants, (d) victims, (e) methods of commission, or (f) other distinguishing characteristics, including:

   a.  *Similar Purpose.* DoorDash's Predicate Acts had the same purpose of defrauding consumers, like Plaintiff.

   b.  *Similar Results.* DoorDash's fraud on consumers, like Plaintiff, had the same results, insomuch as the company intended to gain and did gain money illicitly.

   c.  *Similar Participants.* DoorDash's predatory practices involved the same cast of characters, namely DoorDash employees, contract drivers, merchants, and unwary consumers.

   d.  *Similar Victims.* DoorDash uniformly injured consumers, like Plaintiff, by depriving them of their monetary property, making each of them a victim of DoorDash's predatory, fraudulent pricing scheme.

   e.  *Similar Methods of Commission.* DoorDash defrauded each consumer, like each Plaintiff, through the DoorDash Platform, which implemented the same fraudulent activities in a uniform manner.

   f.  *Similar Distinguishing Characteristics*. Every step of DoorDash scheme, including its solicitation and advertisement in the mail and the text message and emails, prominently displayed the DoorDash logo or name.

242.     **Continuous Acts.** DoorDash's Predicate Acts are continuous and involve both closed-ended and open-ended schemes.

   a.  First, DoorDash uses a closed-ended scheme under which DoorDash engaged in fraud repeatedly and extensively in number and duration of

---

101 *Id.* § 1961(5).

1    times when using mail solicitations and advertisements, and when
2    accepting and completing each individual consumer order, like
3    Plaintiff's orders, through their, computers, mobile devices, and/or
4    emails. These racketeering activities represent a series of related
5    predicate acts over a substantial period—more than several months or a
6    year for Plaintiff.

7    b.    Second, DoorDash uses an open-ended scheme under which
8    DoorDash has engaged in extensive fraudulent activities for years and
9    continues to engage in such conduct until and unless injunctive relief can
10   end such practices. The threat of these predatory pricing practices
11   continues to rely on the mail to solicit victims of the fraud and uses text
12   and emails to bring the fraud to completion. In other words, DoorDash
13   illegal conduct has lasted years, and the threat will continue indefinitely
14   without judicial intervention.

15   243.    In 2022, the DoorDash Marketplace Gov[102] generated over $53 billion,[103]
16   benefiting extensively from DoorDash's predatory pricing practices which
17   dramatically increased the cost of food and delivery services. In 2022, DoorDash made
18   almost $6.6 billion in revenues, while Dashers made over $13 billion in revenue.[104]
19   Upon information and belief, DoorDash has long viewed Dashers' earnings as an
20   additional revenue source that DoorDash could exploit. After all, many Dashers are
21   unbanked and new to this country, and DoorDash controls the jobs that the Dashers
22   receive and the amount of money that they make.

---

25    102 DoorDash defines its "Marketplace GOV" as the total dollar value of Marketplace orders
26   completed in its local logistics platform, including taxes, tips, and any applicable consumer fees,
27   including membership fees related to DashPass.

     103 Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 61-62 (Feb. 24, 2023).

28    104 *Id.*

244.     In or around December 2020, DoorDash launched the Dasher Direct Program.[105] In a press release announcing the program, DoorDash noted: With Dashers' needs top of mind, we're excited to launch DasherDirect – DoorDash's first financial platform for Dashers, featuring a Business Prepaid  Visa Card and mobile banking app. With no-fee daily deposits, convenient mobile banking functionality, and cash-back rewards, the DasherDirect platform empowers Dashers with more flexibility and control over their earnings.

"DasherDirect is powered by our partners at Payfare and issued by Stride Bank. Through the DasherDirect app, Dashers can check their account balance, pay bills, transfer money, set savings goals and find no fee ATMs on the go – without worrying about overdraft fees or minimum account balance requirements."[106]

245.     On its website under "Introduction to DasherDirect," DoorDash explains, "Payfare is a company that DoorDash partnered with to provide DasherDirect. Payfare provides the mobile app technology and the DasherDirect card is issued by Stride Bank, member FDIC."[107] With respect to its operation, DoorDash pays the Dasher through a direct deposit on a VISA debit card that Stride Bank underwrites.[108] "With DasherDirect, the earnings from [Dasher's] deliveries are deposited instantly at the end of every dash -- for no-fee -- so [Dashers] can access [their] cash when [they] need it." The key lure of the DasherDirect Program is that

---

105 Brandon Silverman et al., *DasherDirect- A Financial Platform Designed for Dashers*, DOORDASH (Dec. 14, 2020), https://doordash.news/dasher/dasherdirect-a-financial-platform-designed-for-dashers/amp/.

106 *Id.*

107 DoorDash Dasher Support, *Introduction to DasherDirect*, DOORDASH, https://help.doordash.com/dashers/s/article/Introduction-to-DasherDirect?language=en_US (last visited May 3, 2023).

108 *Id.*

1    DoorDash does not charge Dashers a fee to receive their earnings daily.

2    246.    Despite having the ability to pay them immediately, DoorDash pays Dashers

3    weekly from the revenues of its racketeering activities. If Dashers want to receive

4    their earned compensation daily, they must pay DoorDash a "Fast Pay" fee of $1.99

5    per transaction (meaning per day) to release their funds each day.[109] With six

6    million Dashers performing deliveries each year,[110] DoorDash stands to make

7    millions in interest holding its drivers' compensation weekly and millions more

8    charging drivers a daily Fast Pay fee. But the DasherDirect Program gives

9    DoorDash the ability to make even more money from the Dashers' billions in

10   annual revenue. Like many in the gig economy, Dashers face the conundrum of

11   how to bridge the gap between when they get paid and when they need their money.

12   This gap creates desperation. DoorDash leverages this desperation by holding

13   Dasher's compensation for up to a week and then levying the "Fast Pay" fee.

14   DoorDash provides "relief" by offering the no-fee daily deposit under the

15   DasherDirect Program. The results: most Dashers participate in the program to such

16   an extent that some Dashers do not even know the Fast Pay fee exists. Upon

17   information and belief, DoorDash now automatically enrolls Dashers into the

18   DasherDirect Program or sends them the materials to enroll at the outset of their

19   engagement.

20   247.    Upon further information and belief, the DasherDirect Program generates

21   revenues from both the Dashers' debit card transactions and the pooled Dashers' funds

22   in which Stride Bank invests. Upon information and belief, DoorDash, Payfare, and

23   Stride Bank share fees generated from the DasherDirect Program.

---

109 DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited May 3, 2023); DoorDash Dasher Support, *What is Fast Pay?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-Fastpay?language=en_US (last visited May 3, 2023).

110 Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 7 (Feb. 24, 2023).

CLASS ACTION COMPLAINT            91

248.     Lost in DoorDash's potential to make millions, if not more, from shared fees under the DasherDirect Program is an undeniable fact. The DasherDirect Program is financed entirely by the funds DoorDash fraudulently procured from consumers, like Plaintiff. DoorDash pays Dashers with these illicit funds, holds those funds for Dashers participating in the DasherDirect Program, and then invests those funds with Stride Bank under the DasherDirect Program. Even if the illicit funds are invested with Stride Bank for a legitimate purpose and even if the program provides beneficial services, the byproduct of the investment income remains tainted by the fact that DoorDash derives the funds from its continuous, fraudulently scheme executed with solicitations through the mail, text message, and email communications— DoorDash's pattern of racketeering activities. In other words, Stride Bank, Payfare, and/or the DasherDirect Program are RICO enterprises that DoorDash has infiltrated with its continuous pattern of racketeering activities—activities that include the predicates of mail and wire fraud. *See* illustration below demonstrating DoorDash RICO scheme:



249.     RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[111] Here, four RICO enterprises exist.

250.     **The Stride Bank, Payfare, and DoorDash Enterprises**. Stride Bank, Payfare, and DoorDash are each independent, corporate enterprises under 18 U.S.C. §1962(a). DoorDash utilized the illicit funds derived from its pattern of racketeering activities to invest in the DasherDirect Program. That investment generated additional income. DoorDash also targeted Stride Bank and Payfare under the DasherDirect Program, providing them with an infusion of illicit funds derived from DoorDash's racketeering scheme.

251.     **The DasherDirect Enterprise.** Under 18 U.S.C. § 1964(c), Stride Bank, DoorDash, and Payfare created the DasherDirect Program through an association in fact (the "Dasher Association"). The Dasher Association created the DasherDirect Program to allow Dashers to conduct digital banking with Stride Bank, which provides private-label banking services that in effect serve as a FDIC insured financial institution conduit. Payfare created and manages the mobile application for Dashers to conduct digital banking under the DasherDirect Program. And DoorDash sits at the top of the Dasher Association.

252.     DoorDash managed the affairs and/or operations of the DasherDirect Program. DoorDash recruited and hired Dashers; advertised the DasherDirect Program on the DoorDash website, including agreements between Stride Bank and Payfare with Dashers; created the program's participation policies and rules; provided Dashers with the tools to participate in and register for the program; and steered and manipulated Dashers' participation in the program through heavy-handed and fraudulent conduct identified herein. DoorDash's heavy-handed and fraudulent

111 18 U.S.C. § 1961(4).

conduct as part of its management of the DasherDirect Program includes, but is not limited to holding Dashers' compensation for up to a week; implementing a Fast Pay for non- participating Dashers; creating rules that prohibited both participating in Fast Pay and the DasherDirect Program; managing the Dashers' funds for purposes of allocating those funds to Stride Bank by each individual Dashers' name who participate in the program; and using its pattern of racketeering activities to control and limit Dasher compensation, creating more leverage to direct or otherwise manipulate Dashers' participation in the DasherDirect Program. The Dasher Association's common purpose under the program was generating fees, either through debit card transactions or pooled investments, from the billions of dollars that Dashers make annually.

253.     Both the activity of the enterprises—the DoorDash, Stride Bank, Payfare, and DasherDirect Enterprises—and the predicate acts of mail and wire fraud underlying DoorDash's racketeering affect interstate commerce. DoorDash, Stride Bank, Payfare, and the DasherDirect Program each involve the sale, acquisition, purchase, and/or investment of goods, services, and monetary property, including the extension of credit, across state lines.

254.     Each Plaintiff is a person as defined under RICO.[112] Plaintiff sustained an injury to their property, including their money and other things of value such as their extension of credit, because of DoorDash's fraudulent, predatory pricing practices and scheme in violation of RICO 18 U.S.C. §§ 1962(a), (c). Specifically, Plaintiff sustained an injury because of DoorDash's racketeering activities insomuch as these acts defrauded Plaintiff causing her a monetary injury in violation of 18 U.S.C. § 1962(c). DoorDash then used the illicit funds fraudulently procured from Plaintiff to invest in the DasherDirect Program, injuring Plaintiff further in violation of 18 U.S.C. § 1962(a).[113] Under both situations, DoorDash was the factual and proximate cause of

---

112 18 U.S.C. § 1961(3).

113 A plaintiff need not allege injury from the use or investment of racketeering proceeds. *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 264 n.2 (4th Cir. 2001); *Busby v.*

Plaintiff's injuries. But for DoorDash's actions that deprived Plaintiff of her property through mail and wire fraud, Plaintiff would not have been injured.

255.     Within the last four years, each Plaintiff incurred an injury due to DoorDash's wire and mail fraud.

## CLASS ACTION ALLEGATIONS

256.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs by reference.

257.     Plaintiff brings this action on her own behalf and as a class action on behalf of the similarly situated class members as defined herein. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The class consists of tens or hundreds of thousands, if not millions, of DoorDash users who were inappropriately and illegally charged fees as part of the DoorDash scheme.

258.     Plaintiff seeks to recover these damages for herself and a class of similarly situated individuals who paid the following: (1) any and all delivery fees of any kind to DoorDash as DoorDash's records will establish; (2) hidden marketing fees on promotional items as DoorDash's records similarly will establish; and/or (3) any and all hidden commissions or commission fees that DoorDash included in or took from menu items advertised to and paid by consumers using the DoorDash Platform, which also will be reflected in DoorDash's records.

259.     Specifically, Plaintiff Masters brings this suit on her own behalf and as the Class representative on behalf of the following:

    a.     **Nationwide Class:** All persons in the United States who, within the relevant statute of limitations periods, established a DoorDash account and placed an order using either the DoorDash App or the website DoorDash.com and who paid a "Delivery Fee," an "Express (or Priority) Delivery Fee," and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that

_Crown Supply, Inc._, 896 F.2d 833, 836-40 (4th Cir. 1990).

included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees ("the Nationwide Class").

b. **South Carolina Subclass:** All persons resident in the State of South Carolina who, within the relevant statute of limitations periods, established a DoorDash account and placed an order using either the DoorDash App or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "South Carolina Subclass").

260.    DoorDash subjected Plaintiff (including the Nationwide Class, and South Carolina Subclass) (collectively "Plaintiff") to the same wrongdoing and harmed them in the same manner. Plaintiff seeks to enforce the same rights and remedies pursuant to the same legal theories including: declaratory relief, injunctive relief, fraud (intentional misrepresentation or deceit), negligent misrepresentation, and a violation of the California Unfair Competition Law, California Business and Professions Code §§ 17200 et seq ("UCL").

261.    **Numerosity**: The proposed Class and Subclasses are so numerous that joinder of all members is impracticable. While the precise number and identities of class members are unknown at this time, targeted discovery will provide the information.

262.    **Typicality:** Plaintiff's claims are typical of the claims of the Class and Subclasses because the claims arise from the same event or practice or course of conduct. Plaintiff is advancing legal theories applicable to the Class and Subclasses. And Plaintiff's measure of damages is the same as the measure of damages applicable to the Class and Subclasses.

263.    **Adequacy:** Plaintiff and her counsel will fairly and adequately represent and protect the interest of the Class and Subclasses. Plaintiff's counsel have considerable and substantial experience in prosecuting and defending complex

1   litigation, including class actions. Plaintiff and Plaintiff's counsel intend to

2   vigorously pursue this litigation on behalf of themselves and the Class and

3   Subclasses and have the financial resources to do so. Neither Plaintiff nor Plaintiff's

4   counsel have any interests adverse to the interests of the Class and Subclasses.

5   264.   **Superiority of Class Action**: Plaintiff has suffered the same harm because of

6   DoorDash's unlawful conduct, and the same claims and defenses are at issue for all

7   possible plaintiffs. A class action is superior to other methods for the fair and efficient

8   adjudication of the controversy. Joinder of individual members of the Class and

9   Subclasses is impractical, inefficient, and unduly burdensome on the individual

10   members. By employing a class action vehicle, a single court can adjudicate the issues

11   resulting in both judicial economy and the fair and equitable handling of all class

12   claims. And a class action conserves the parties' resources and protects the rights of the

13   Class and Subclasses. Were these claims to be adjudicated individually, as a practical

14   matter, the individual adjudications would be dispositive of the interests of other

15   members not parties to the adjudication and could substantially impair and impede the

16   ability of the other members of the Class and Subclasses to protect their interests.

17   265.   **Common Questions of Law and Fact Predominate**: To further satisfy the

18   requirements of Fed. R. Civ. P. 23, there are questions of law and fact common to

19   Plaintiff's claims and the claims of the Class and Subclasses that predominate over

20   any question of law or fact that relates to any individual member of the Class or

21   Subclasses. Common questions of law and fact include, without limitation, at least:

22       i.   Whether DoorDash properly and appropriately informed Plaintiff and

23           Class Members about the Terms and Conditions when they signed up

24           for the DoorDash service, including:

25       ii.   Whether DoorDash made a definitive offer supported by consideration.

26       iii.   Whether by signing up for DoorDash a consumer had the requisite intent

27           or assent to contract with DoorDash that, among other things, purported

28           to require the arbitration of any disputes and to impose a limit on the type

        and amount of damages that could be recovered.

iv.   If a contract was formed, whether the arbitration clause is severable from the rest of the contract and whether it is supported by sufficient consideration.

v.   If a contract is formed, whether the arbitration agreement is a contract of adhesion.

vi.   Whether DoorDash made false representations of material fact.

vii.   Whether DoorDash knew or should have known that its representations of material fact were false.

viii.   Whether DoorDash represented material fact with such reckless disregard for the truth that knowledge of the falsity can be imputed to DoorDash.

ix.   Whether DoorDash falsely represented material fact with the purpose of defrauding or deceiving consumers.

x.   Whether Plaintiff and The Classes justifiably relied or had a presumption of reliance on DoorDash's false representations of material fact given the true nature of DoorDash's false representation was not determinable through the exercise of ordinary intelligence or diligence.

xi.   Whether Plaintiff and The Classes suffered actual damages because of their justifiable or presumed reliance on DoorDash's false representations of material fact.

xii.   Whether DoorDash owed a duty of care and/or candor to Plaintiff and The Classes as a matter of law.

xiii.   Whether DoorDash, in breach of its duty of care and/or candor to Plaintiff and The Classes, negligently made false representations of material fact.

xiv.   Whether DoorDash, in breach of its duty of care and/or candor to Plaintiff and The Classes, negligently made false representations of material fact with the intention that Plaintiff and The Classes would rely upon and act in response to the false representations.

xv.   Whether DoorDash knew or should have known that Plaintiff and The Classes would rely on DoorDash's false representations of material fact.

xvi.     Whether Plaintiff and The Classes justifiably relied or had a presumption of reliance on and acted in response to DoorDash's false representations of material fact.

xvii.    Whether Plaintiff and The Classes suffered damages proximately caused by DoorDash's negligence.

xviii.   Whether DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, misrepresented material facts to consumers, like Plaintiff, including the fact that:

1.  DoorDash knew or should have known it had no ability to control the manner or means of how or when Dashers performed their deliveries;

2.  DoorDash knew or should have known that "direct to you" advertisement is misleading;

3.  DoorDash knew or should have known that Dashers can stack orders;

4.  DoorDash knew or should have known that Dashers did not know whether a consumer had paid for an express delivery;

5.  DoorDash knew or should have known that as soon as a consumer chose an expedited delivery, the time for the delivery would be extended beyond the range for a standard delivery; and

6.  DoorDash knew or should have known that the pre-order delivery windows were misleading and likely to entice consumers, like Plaintiff, into placing orders.

xix.     Whether DoorDash, in adopting, promoting, and/or charging its Delivery Fee, misrepresented material facts to consumers, like Plaintiff, including the fact that:

1.  Dashers did not receive the Delivery Fee for their deliveries and that DoorDash retained the Delivery Fee completely;

2.    DoorDash knew or should have known that its advertising tactics regarding discounts on the Delivery Fee were misleading;

3.    DoorDash knew or should have known the Delivery Fee had nothing to do with the delivery of orders for consumers, like Plaintiff, but instead related to the alleged cost to operate DoorDash's technology;

4.    DoorDash knew or should have known the Delivery Fee was an advertising sales gimmick; and

5.    DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiff, into placing orders.

xx.    Whether DoorDash, in adopting, promoting, and/or charging its Extended Range Delivery Fee, misrepresented material facts to consumers, like Plaintiff, including the fact that:

1.    DoorDash knew or should have known that consumers, like Plaintiff, did not have normal delivery areas;

2.    DoorDash knew or should have known that they created delivery areas based on its merchants' paid relationship with DoorDash without regard to closer delivery locations for consumers, like Plaintiff, based on their location;

3.    DoorDash concealed a material fact from Plaintiff that DoorDash charges the Extended Range Fee as a manner of increasing profit independent of Plaintiff's normal delivery area; and

4.    DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiff's, into placing orders.

xxi.   Whether DoorDash, in adopting, promoting, and/or charging its Marketing Fee, misrepresented material facts to consumers, like Plaintiff's, including the fact that:

1. DoorDash knew or should have known that consumers, like Plaintiff's, could not discover the hidden Marketing Fee through the exercise of ordinary diligence or intelligence;

2. DoorDash knew or should have known that consumers, like Plaintiff, paid for promotional items for which they incurred and paid an unknown $0.99 that DoorDash collected; and

3. DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiff, into placing orders.

xxii.   Whether DoorDash engaged in racketeering activity through the predicate acts of mail and wire fraud, including:

1. Whether DoorDash used a persistent course of conduct over numerous years to send advertisements through the mail to consumers; and

2. Whether DoorDash used text messages and email communications to contact consumers.

xxiii.   Whether DoorDash's predicate acts are part of its complex fraudulent scheme to defraud consumers through a series of solicitations, misrepresentations, and deceiving advertisements, statements, and pricing practices.

xxiv.   Whether DoorDash engaged in a pattern of racketeering activity.

xxv.   Whether DoorDash's predicate acts are related or interrelated because they have the same or similar purposes, results, participants, victims, methods of commission, or other distinguishing characteristics.

xxvi.   Whether DoorDash's predicate acts are continuous and involve both closed-ended and open-ended schemes.

xxvii.   Whether Stride Bank is an "enterprise" under the RICO statute.

xxviii.   Whether the DasherDirect Program is an "enterprise" under the RICO statute.

xxix.   Whether DoorDash's relationship with Stride Bank, Payfare, and the DasherDirect Program constitute an association in fact "enterprise" under the RICO statute.

xxx.   Whether the enterprise and the racketeering activity affect interstate commerce.

xxxi.   Whether Plaintiff sustained an injury as a result of DoorDash's racketeering activity.

266.   **Notice:** There are myriad methods for providing notice to the Class and Subclasses including internet publication, utilization of social media, and traditional published notice—all of which would be paid by DoorDash.

267.   The Class and Subclasses specifically exclude counsel, including counsels' employees, representing the Class and Subclasses, any judicial officer presiding over this matter, the members of the judicial officers' immediate families and judicial staff, and any individual whose interests are antagonistic to the interests of other Class and Subclass members.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

Based on all the allegations herein, Plaintiff respectfully demands relief under the following causes of action:

### FIRST CLAIM FOR RELIEF

### (DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)

268.   Plaintiff reasserts, realleges, and incorporate herein by reference the allegations set out in all previous paragraphs when asserting the foregoing cause of action.

269.   Pursuant to Fed. R. Civ. P. 23(b)(2), Class-wide declaratory judgment and injunctive relief is appropriate because DoorDash has acted or refused to act on grounds that apply generally to Plaintiff and Class Members.

270.     More specifically, DoorDash has adopted a fee structure for its delivery services that is misleading and induces consumers to act to their detriment.

271.     DoorDash's method of giving consumers, including minor consumers, notice of the Terms and Conditions that DoorDash will likely argue apply in this case was inadequate to secure the consent of any consumer and, therefore, there is no contract between DoorDash and any consumer.

272.     Regardless of which method that consumers, like Plaintiff, used to sign up, DoorDash's wrap agreement did not require or allow consumers, to manifest assent to the Terms and Conditions and Privacy Policy expressly; consequently, there is no contractual relationship between DoorDash on the one hand and Plaintiff, the Class, and Subclasses on the other.

273.     Instead, Plaintiff registered and used the DoorDash Platform without seeing or reviewing the Terms and Conditions page.

274.     This claim for declaratory judgment seeks a determination that (a) there is no contract between DoorDash and Plaintiff, the Class, and Subclasses; (b) this action may proceed as a class action before this court; and (c) such other and further relief as is necessary and appropriate, including the relief outlined in the paragraph below.

275.     The Court must determine this issue of contract formation in which Plaintiff for herself and the Classes, challenge both DoorDash's purported contract and its purported arbitration agreement. In trying to remove important determinations from the Court's purview contrary to applicable law, DoorDash's Terms and Conditions refer to delegating issues of "formation of this Arbitration Agreement" to the arbitrator, "including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable[.]"

276.     In doing so, the arbitration agreement conflates issues of contract formation with issues of contract rescission rendering the delegation language ambiguous and thus unenforceable, in addition to being contrary to applicable law.

277.     In seeking declaratory relief, Plaintiff will need limited, targeted discovery on issues relating to formation including but not limited to changes DoorDash made to its

1    sign up/registration page over the last four years and changes DoorDash has made to its

2    Terms and Conditions over the last four years.

3    278.    To remedy the injuries that DoorDash's misleading fee structure has caused,

4    Plaintiff is entitled to at least the following injunctive relief:

5        a.   A declaration that DoorDash adopt an open and straightforward fee structure so that

6           consumers will understand what they are paying for and how their fees are

7           distributed and allocated; and

8        b.   A declaration that DoorDash cease and desist from its misleading and fraudulent

9           practices by charging or advertising delivery fees in any form when it does not

10          deliver.

11   **SECOND CLAIM FOR RELIEF**

12   **(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT**

13   **THE ARBITRATION AGREEMENT IS UNENFORCEABLE)**

14   279.    Plaintiff reasserts, realleges, and incorporates herein by reference the allegations

15   set out in all preceding paragraphs when asserting the foregoing cause of action.

16   280.    In the event a court determines that a contract was formed when a consumer,

17   signed-up and used DoorDash's services, declaratory relief is still necessary and

18   appropriate.

19   281.    Arbitration clauses are severable from the whole of the contract in which they

20   are contained.

21   282.    To be enforceable, arbitration clauses require consideration independent of any

22   consideration for the remainder of the Terms and Conditions.

23   283.    In this case, the consideration for the arbitration agreement is illusory because

24   DoorDash reserves the right to modify the Terms and Conditions at any time. So, in

25   paragraph14(h), DoorDash says that "updates to these Terms and Conditions do not

26   provide a new opportunity to opt out of the Arbitration Agreement for customers or Users

27   who had previously agreed to a version of [these] Terms and Conditions" Thus,

28   DoorDash retained the right to unilaterally change the terms and conditions without

     affording a subsequent opt-out right. As a result, the consideration is illusory.

284.     Alternatively, in paragraph 3 of the Terms and Conditions, DoorDash "reserves the right to modify the terms and conditions of this Agreement . . . at any time " Because the modification agreement was contained within the same Terms and Conditions as the arbitration agreement, there was insufficient consideration to support an enforceable agreement to arbitrate.

285.     Given the lack of consideration, the arbitration provision is unenforceable to Plaintiff.

286.     This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) there is no enforceable arbitration agreement between DoorDash and the Plaintiff; and (c) such other and further relief as is necessary and appropriate, including the relief outlined in paragraph below.

287.     To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiff is entitled to at least the following injunctive relief:

a.   A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

b.   A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

c.   Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; and (b) the arbitration clause is unenforceable against all consumers for the same reason concerning the lack of adequate consideration.

## THIRD CLAIM FOR RELIEF

### (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ARBITRATION PROVISION IS AN UNENFORCEABLE CONTRACT OF ADHESION)

288.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

289.    In the event a court determines that a contract was formed when a consumer signed-up and used DoorDash's services, and in the event a court determines that the consideration for the arbitration provision in the contract is sufficient, declaratory relief is still necessary and appropriate.

290.    The arbitration provision contains a waiver of significant rights including the right to a trial by jury, the right to bring an action as a class action, and the right to seek injunctive relief. It also imposes a drastically reduced statute of limitations.

291.    The arbitration provision is itself a contract of adhesion in that was drafted unilaterally by the dominant party and then presented on a take-it-or-leave-it basis to the weaker party who has no real opportunity to bargain about its terms.

292.    A court can decline to enforce an arbitration provision that is so one-sided as to oppress or unfairly surprise an innocent party or when there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause.

293.    The arbitration provision at issue is as one-sided as a contract provision could possibly be. DoorDash receives protection from a jury, shelter from important kinds of relief, and a shield against collective claims. The consumers get nothing in return.

294.    Alternatively, given the oppressive nature of the contract of adhesions terms and the waiver of critical rights, consumers, like Plaintiff, could only manifest assent to the contract through an affirmative acknowledgement separate and independent of any implicit consent purportedly provided by "signing up" for a DoorDash account.

295.    This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) the arbitration provision is a contract of adhesion; (c) the arbitration provision is null and void; (d) Plaintiff is entitled to recover for their injuries incurred because of DoorDash's misleading fee structure; (e) Plaintiff is entitled to an award of attorneys' fees and expenses to be determined by the Court; and (f) such other and further relief as is necessary and appropriate, including the relief outlined below.

296.    To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiff is entitled to at least the following injunctive relief:

a. A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

b. A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

c. Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; and (b) the arbitration clause is unenforceable against all consumers for the same reason concerning the lack of mutual assent absent an express affirmation of acceptance of the contract terms.

## FOURTH CLAIM FOR RELIEF

### (RICO VIOLATION OF 18 U.S.C. § 1962(a))

297.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

298.     This cause of action is against DoorDash.

299.     DoorDash and/or Stride Bank and/or the DasherDirect Program are enterprises whose activities affect interstate commerce.

300.     DoorDash and/or Stride Bank and/or the DasherDirect Program used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically, DoorDash used and invested the racketeering income into the DasherDirect Program and invested into other programs, like DoorDash Capital. DoorDash made additional income from the invested racketeering income.

301.     DoorDash's mail and wire fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

302.     As a direct and proximate result of DoorDash's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in their business and property in that they have suffered a monetary injury.

CLASS ACTION COMPLAINT          107

303.     WHEREFORE, Plaintiff requests that this Court enter judgment against DoorDash on this cause of action as follows:

   a.   An award of actual damages, the precise measure of which to be determined;

   b.   An award of treble damages; and

   c.   An award to attorney's fees and expenses.

**FIFTH CLAIM FOR RELIEF**

**(RICO VIOLATION OF 18 U.S.C. § 1962(c))**

304.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

305.     This cause of action is against DoorDash.

306.     Stride Bank and/or the DasherDirect Program is an enterprise engaged in and whose activities affect interstate commerce.  DoorDash is associated with the enterprise.

307.     DoorDash agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically, DoorDash recruited and hired Dashers; advertised the DasherDirect Program on the DoorDash website, including agreements between Stride Bank and Payfare with Dashers; created the program's participation policies and rules; provided Dashers with the tools to participate in and register for the program; and steered and manipulated Dashers' participation in the program through heavy-handed and fraudulent conduct identified herein. DoorDash's heavy-handed and fraudulent conduct as part of its management of the DasherDirect Program includes, but is not limited to, holding Dashers' compensation for up to a week; implementing a Fast Pay for non-participating Dashers; creating rules that prohibited both participating in Fast Pay and the DasherDirect Program; managing the Dashers' funds for purposes of allocating those funds to Stride Bank by each individual Dashers' name who participate in the program; and using its pattern of racketeering activities to control and limit Dasher compensation, creating more leverage to direct or otherwise manipulate Dashers' participation in the DasherDirect Program.

308.     Pursuant to and in furtherance of their fraudulent scheme, DoorDash committed multiple related acts of mail and wire fraud.

309.     The mail and wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

310.     DoorDash directly and indirectly has conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

311.     As a direct and proximate result of DoorDash's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in her business and property in that she has suffered monetary injury.

312.     WHEREFORE, Plaintiff requests that this Court enter judgment against DoorDash on this cause of action as follows:

    a.   An award of actual damages, the precise measure of which is to be determined;

    b.   An award of treble damages; and

    c.   An award to attorney's fees and expenses.

**SIXTH CLAIM FOR RELIEF**

**(FRAUD OR DECEIT)**

313.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

314.     DoorDash made false representations or omissions of material fact to Plaintiff, including but not limited to: DoorDash drivers would be paid delivery fees for making deliveries; DoorDash had the ability to control the time and manner of a consumer's delivery; an express order would be delivered directly to the consumer; drivers knew when orders were priority and direct to you; the Extended Range Fees arose from consumers' locations and applied to all consumers equally; advertised delivery windows represented true estimates of the prospective delivery time; advertised discounts represented actual discounts; each delivery fee was logically derived and not an unjustifiable advertisement or phantom charge passed back to the consumer by increasing

a different charge/fee; promotional items did not include hidden fees that consumers paid; DashPass members received savings represented by strikethrough pricing; and menu items did not include commissions and fees including surcharges on credit card payments.

315.     DoorDash made false representations and omissions during each instance consumers, like Plaintiff, placed an order on the DoorDash website or the DoorDash App and DoorDash advertised, charged and/or collected a Delivery Fee, an Express Fee, an Extended Range Fee, a Marketing Fee, and/or a Commission Fee from consumers, like Plaintiff, on their respective order.

316.     Among the false representations and omissions, in addition to those discussed above, that DoorDash made include, at least, the following:

a.   DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, knew or should have known that it had no ability to control the manner or means of how or when Dashers performed their deliveries;

b.   DoorDash knew or should have known that "direct to you" as used for the Express Delivery Fee advertisements was not only misleading but patently false because DoorDash knew Dashers could stack orders, Dashers did not know that a consumer had paid a direct delivery fee, and the delivery time would actually exceed that for a standard delivery without any warning that was possible;

c.   The inference that the Express Delivery Fee was paid to Dashers;

d.   The Delivery Fee had nothing to do with the actual delivery of orders for consumers but instead related to the cost to operate the DoorDash Platform/technology;

e.   DoorDash knew or should have known the Express Delivery Fee was simply an advertising gimmick and not a real effort to get orders to consumers sooner;

f.   DoorDash established the Extended Range Delivery Fee but knew or should have known consumers did not have "normal delivery areas";

g.   DoorDash, in assessing the Extended Range Delivery Fee, knew or should have known the delivery fee was based on the restaurants' paid relationships with DoorDash and had nothing to do with the location of the consumer;

h. DoorDash concealed that DoorDash charges the Extended Range Fee as a means of increasing profit;

i. DoorDash knew or should have known the delivery windows it promised were illusory and merely intended to entice consumers into placing orders;

j. DoorDash incorporated a "marketing fee" into the charges to consumers, knowing that consumers, in the exercise of ordinary diligence, could not discover the hidden fee;

k. DoorDash knew or should have known that consumers were paying for promotional items through payment of a $0.99 marketing fee that was undisclosed and that misled consumers to believe they were getting something for free or at a reduced price;

l. DoorDash knew or should have known that it charged and collected from consumers commission fees that it did not disclose and surreptitiously included in the price of menu items;

m. DoorDash knew or should have known that the commission fees included credit card surcharges that it did not disclose and surreptitiously included in the price of menu items;

n. DoorDash knew or should have known that it used price drip, dark patterns, and partition pricing in advertising prices and fees to deceive consumers into transactions;

o. DoorDash knew or should have known that its disclosure omitted, misstated, or incorrectly provided information about its prices and fees; and

p. DoorDash knew or should have known that it provided misleading and false pricing and savings without disclosing such information to consumers.

317. DoorDash knew, and had actual knowledge, that the representations it made to Plaintiff were false.

318. Alternatively, DoorDash acted with reckless disregard of the truth of its representations to Plaintiff such that it would be reasonable to charge DoorDash with the falsity of its representations.

319.     DoorDash intended that Plaintiff would act in reliance on DoorDash's false representations.

320.     Plaintiff relied on DoorDash's false presentations and Plaintiff's reliance was justified and justifiable—whether it was reasonable, justifiable, or mere reliance on fact—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiff did here—on the representations of another.

321.     As a direct and proximate result of DoorDash's fraudulent misrepresentations, Plaintiff sustained damages.

322.     DoorDash acted with malice in making false representations and Plaintiff is therefore entitled to recover punitive damages.

## SEVENTH CLAIM FOR RELIEF

## (FRAUDULENT CONCEALMENT)

323.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

324.      DoorDash took affirmative action to conceal a material fact that Plaintiff could not have discovered even with the exercise of reasonable diligence

325.     DoorDash had a duty to disclose material facts because DoorDash's concealment of the facts underlying its express and extended range charges, and other fees and chargers, was intentional and effective. DoorDash hid material facts with the attained object of creating or continuing a false impression as to that fact. DoorDash's affirmative suppression of the truth was made with an intent to deceive.

326.      DoorDash also had a duty to disclose material facts when DoorDash tried to obfuscate and confuse consumers with psychologically manipulative pricing structure to conceal the real nature of the charges

327.      DoorDash failed to disclose materials facts, including (a) that it was charging an express fee with the representation the order would be directly delivered to the consumer when DoorDash had no ability to control the time or manner of deliveries: (b) that it was charging an express fee with the representation the order would be delivered faster than

the predicted order time for a non-express order when, in fact, the express delivery frequently took longer to be received; (c) that DoorDash had no factual basis for imposing the extended range delivery fee; and that other fees and charges as detailed above were similarly misleading.

328.     DoorDash intended to defraud or deceive Plaintiff.

329.     Plaintiff took actions, namely using DoorDash's service, in reliance on its concealment. Plaintiff's reliance—whether it was reasonable, justifiable, or mere reliance on fact—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiff did here—on the representations of another.

330.     As a direct and proximate result of DoorDash's fraudulent concealment, Plaintiff sustained damages.

331.     Further, DoorDash acted with malice in failing to disclose material facts and Plaintiff is therefore entitled to recover punitive damages.

## EIGHTH CLAIM FOR RELIEF
## (NEGLIGENT MISREPRESENTATION)

332.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

333.     DoorDash owed a legal and statutory duty of care to Plaintiff, including but not limited to a duty of care arising out of its role as an entity that directly or indirectly sold and/or marketed goods and services to Plaintiff.

334.     Plaintiff relied on DoorDash's false presentations and Plaintiff's reliance— whether it was reasonable, justifiable, or mere reliance on fact—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiff did here—on the representations of another.

335.     DoorDash negligently made false statements of material fact about its delivery and service fees.

336.     DoorDash intended that Plaintiff would act in reliance upon the false statements of material fact referenced above.

337.     DoorDash knew or should have known that Plaintiff would rely on the false statements of material fact referenced in paragraphs above.

338.     Plaintiff justifiably acted in reliance on the false statements of material fact referenced in paragraphs above.

339.     As a direct and proximate result of DoorDash's negligent misrepresentation, Plaintiff sustained damages.

340.     Further, DoorDash acted with malice in making its misrepresentations and Plaintiff is therefore entitled to recover punitive damages.

**NINTH CLAIM FOR RELIEF**

**(UNJUST ENRICHMENT)**

341.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

342.     DoorDash owed a legal and statutory duty to Plaintiff to not unfairly or unduly take advantage of them or to commit wrongful acts to enrich itself at Plaintiff's expense.

343.     Plaintiff conferred a benefit on DoorDash by placing orders for the delivery of food from merchants and paying for the delivery of food by Dashers.

344.     DoorDash knew and/or appreciated the benefit that Plaintiff conferred.

345.     DoorDash accepted or retained the benefit under circumstances that would be inequitable to allow DoorDash to retain the benefit without the paying of value in return

346.     As a direct and proximate result of DoorDash's unjust enrichment, Plaintiff sustained damages.

**TENTH CLAIM FOR RELIEF**

**(VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW; CAL Bus.**

**& Prof. Code §§17200 ET SEQ)**

347.     Plaintiff reasserts, realleges, and incorporates herein by reference the allegations set out in all preceding paragraphs when asserting the foregoing cause of action.

348.     DoorDash engaged in unfair, abusive, or deceptive trade practices in violation of the California Unfair Competition Law ("UCL").

349.     Specifically, DoorDash has made false statements which have the capacity, tendency, or effect of deceiving or misleading consumers, which is an unfair business practice.

350.     In addition, DoorDash has failed to state a material fact and its failure to state a material fact deceives or tends to deceive consumers.

351.     And in violation of the California Unfair Protection Law, DoorDash has engaged in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent to have a consumer rely on the same with the promotion or sale of any consumer goods, consumer realty, or consumer service.

352.     As a direct and proximate result of DoorDash's violation of the California Unfair Protection Law, Plaintiff sustained damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, the Class and Subclass, DEMAND:

353.     A jury trial on all issues so triable;

354.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, and an order freezing assets;

355.     Entry of a permanent injunction to prevent DoorDash from engaging in future fraudulent or misleading pricing practices and violations of California Unfair Competition Law including but not limited to prohibiting DoorDash from advertising or collecting any delivery fee whatsoever of any kind unless such fee is collected for and paid to delivery drivers and prohibiting DoorDash from advertising and collecting any hidden marketing fee;

356.     Award such relief, including monetary damages consistent with the law, as the Court finds necessary to redress injury to consumers, like Plaintiff, resulting from

Defendants' deceptive and fraudulent actions, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

357.     Award treble damages; and

358.     Award Plaintiff the costs of bringing this action together with attorneys' fees, as well as such other and additional relief as the Court may determine to be just and proper.


Dated: June 7, 2023                    By: */s/ Eric M. Poulin*
                                       **POULIN | WILLEY | ANASTOPOULO, LLC**
                                       Eric M. Poulin (California Bar No. 298476)
                                       Blake G. Abbott (Pro Hac Vice Forthcoming)
                                       Paul J. Doolittle (Pro Hac Vice Forthcoming)
                                       32 Ann Street
                                       Charleston, SC 29403
                                       Tel: (803) 222-2222
                                       Email: eric@akimlawfirm.com
                                                blake@akimlawfirm.com
                                                pauld@akimlawfirm.com

                                       *Attorneys for Plaintiff Kameron Masters*